### M. SANDITEN v. STATE.

No. A-3580.   Opinion Filed Oct. 13, 1921.
Rehearing Denied Sept. 23, 1922.
(208 Pac. 1040.)

(Syllabus.)

1.   **Larceny—Asportation Procured by Accused.** An asportation of property feloniously taken is a necessary element of the crime of larceny, but such asportation need not be the physical act of the accused. It is sufficient if the accused procured or directed the asportation.

2.   **Indictment and Information—Information against Accessory—Sufficiency.** No additional facts need be alleged in an information against an accessory than are required against his principal. All who aid or abet in the commission of the offense are principals, under the provisions of sections 2104 and 5757, Rev. Laws 1910; and the information need not state whether the accused committed the act alone or in conjunction with others confederating with him.

3.  **Same—Statute Abolishing Distinction Between Accessory and Principal Constitutional.** The abolition by statute of distinctions between accessories and principals, and the statutory provision that no additional facts need be alleged against an accessory than are required against the principal, is not in violation of section 20 of the Bill of Rights, affording every defendant in a criminal case the right to be informed of the nature and cause of the accusation against him.

4.  **Appeal and Error—Harmless Error—Question as to Witness' Unfriendly Feeling.** Questions propounded by the couunty attorney held not prejudicial.

5.  **Same—Invited Error—Remarks of County Attorney Provoked by Defendant's Argument.** Where the argument of defendant's counsel is not brought up in the record, alleged improper remarks made by the county attorney in his closing argument, appearing to have been suggested or provoked by the argument of defendant's counsel will not be considered prejudicial, under the conditions shown by this record. The defendant cannot provoke or invite improper argument upon which to predicate error.

Appeal from Superior Court, Okmulgee County; R. E. Simpson, Judge.

M. Sanditen was convicted of larceny and sentenced to serve a term of five years in the state penitentiary, and he appeals. Affirmed.

M. Dennis, John Caruthers, E. M. Carter, C. B. McCrory, and Thos H. Owen, for plaintiff in error.

S. P. Freeling, Atty. Gen., and W. C. Hall and E. L. Fulton, Asst. Attys., Gen., for the State.

BESSEY, J.  On January 6, 1919, M. Sanditen, plaintiff in error, hereinafter designated the defendant, was informed against in the superior court of Okmulgee county for the larceny of eight joints of 6⅝ pipe or casing, of the value of $243, accomplished by fraud and stealth, and the property of the White Rock Oil & Gas Company. He was found guilty, and, by the verdict of the jury his punishment was fixed at five years in the state penitentiary.

The defendant in his testimony claims that he innocently sold the pipe or oil casing in question for Sam Foster, believing that it belonged to Foster, or that Foster had authority to dispose of it. The evidence on the part of the state tends to show that both Foster and this defendant were acting together and that the defendant, by himself or in conjunction with Foster, knowingly and by fraud and stealth sold this casing to P. C. Smith, for the Sequoyah Oil & Refining Company, and caused it to be delivered to this company without the knowledge or consent of the rightful owners of the pipe.

First. The defendant in his briefs insists that the court erred in overruling defendant's motion for a new trial and in overruling the demurrer to the state's evidence, for the reason that the testimony as a whole did not show that the defendant took physical possession of the pipe in question; that an asportation is a necessary element of larceny and there was no asportation by the defendant. On this feature of the case the testimony on the part of the state and of the defendant is that P. C. Smith wanted to buy some 6⅝-inch casing and went to defendant's place of business in Okmulgee and there purchased from defendant a small quantity of casing that was in defendant's yards, but not sufficient to supply his needs. At the same time the defendant sold Mr. Smith the casing here involved, which was then located on a vacant lot near a livery barn in another part of town. Smith and the defendant went to this lot, measured this pipe, arranged for the payment of the purchase price, and the defendant authorized the purchaser to remove the pipe, which was accordingly done on the day following. We quote from the record:

Testimony of P. C. Smith.

"Q. Go on and tell how you came to buy the casing, the details and circumstances. A. Why, I telephoned amongst some other fellows, about I wanted some 6⅝-inch casing. I

asked Sanditen if he had any. He asked me how much I wanted. I believe I told him about 600 feet. He said he didn't have that much, but would let me have all he had. I got my car and drove down, to his office, and we went out in the yard together and measured up some he had in his yard. I don't remember how much—three or four joints, not very much. I asked if that was all he had. 'No, I have some more,' he said. 'I have bought it, made the deal for it, and everything, but me and the party I bought it from couldn't agree on the price.' 'Well,' I said, 'maybe you can't get it then.' 'Yes, I think we can agree on that all right.' 'Will you see about it right away?' I asked him. 'Yes, I will go and see about it at once.' I asked him where it was. I think he told me the name of the street. I don't know the names of the streets down here. I got in my car and drove where he told me. I couldn't find anything; went back and told him I couldn't find it. He said, 'I will go down with you in a few minutes.' He got in his car, I got in my own car, and drove down there; that was the second street, I believe, east of the Council House building, in a vacant lot. We drove down there and stopped and got out, and he said he wanted to see somebody. I don't remember just what it was. I stood around there and waited until he came back. 'Did you make your deal all right?' I asked him. 'Yes,' he said, ' all right.' We walked back into the vacant lot back from the street 150 feet. There was some pipe piled up there. He called some other fellows to help measure. They measured, called off the amount of feet in each joint, and I wrote it down, the tally. When we got done it was too late to send it to Youngston, so I sent the truck down the next day and took the pipe to Young-ston. I gave him a requisition order on the company, at $1.25 a foot, and we paid for it. That's all. * * *

"Q. Did Bill George help you measure that pipe, help you out in the measuring of the pipe? A. He helped lift some; yes, sir."

W. A. George, owner of the livery barn and a witness for the defendant, testified in part as follows:

"Q. Was there anything said at that time by Sanditen or yourself about hauling the pipe away that morning? A. Yes,

Mr. Smith said he was in a hurry for the pipe. I had a truck there that was idle, and I told him I would shoot it right out for him. He said, 'No,' he would rather use the company's truck. 'The company has a truck of its own.' He didn't give me the job.

"Q. On account of the fact he had a truck of his own? A. Yes."

"Q. Did Sanditen say anything with reference to hauling it away, make any statement about it? A. He said something about it; it seemed as though Mr. Smith was going to send a truck down right then, and Sanditen spoke up, the best I remember, 'Wait a little while, I got to see another fellow,' didn't say who it was."

From the quoted portions of the record it will be seen that there was some asportation; that some of this pipe was moved when it was measured. Whether there was a sufficent asportation at this time or not, the testimony shows that the defendant authorized the innocent purchaser to take absolute control of the pipe, authorized him to remove it, and that it actually was removed, pursuant to such arrangement. To us it seems that the accused himself need not have moved the article stolen. It is a sufficient asportation if he procured or directed its removal. State v. Rozeboom, 145 Iowa, 620, 124 N. W. 783, 29 L. R. A. (N. S.) 39.

In an early English case it was held that where a person went to an inn, intending to steal a horse, and directed the hostler to bring out his horse, pointing to that of the prosecutor, and the hostler led out the horse for the defendant to mount, this was a sufficient taking to support an indictment. Rex v. Pitman, 2 Carrington & Payne, 423.

Cummings told Sweet he wanted to sell him a sow and pigs. After agreeing upon the price, they went to where the sow and pigs were lying on the commons, and Cummings pointed them out as his. Sweet paid him the money and drove

them away.  The animals, in fact, belonged to a neighbor. Held, that Cummings was guilty of a felonious taking, through Sweet as his instrument; that the asportation was the physical act of Sweet, but the felonious taking was that of Cummings accomplished through Sweet.  Cummings v. Commonwealth, 5 Ky. Law Rep. 200.

While the attention of the baggage master was diverted by an accomplice, the accused changed the checks from his valise to a trunk belonging to another.  The trunk was carried to the destination of the accused by the railway company, where the accused rifled it of its contents.  The accused was held to have been responsible for its wrongful asportation and guilty of larceny.  Commonwealth v. Barry, 125 Mass. 390.

Where one, without right or authority, sells to an innocent purchaser an animal belonging to a third person and authorizes the purchaser to take it, this makes the taking an act of the seller, who is guilty of larceny. State v. Hunt, 45 Iowa, 673.

We are not unmindful of the fact that there are authorities that hold that the asportation must be by the thief himself or by some one confederating with him, but to us it seems that the best reason and the weight of authority support the doctrine that the asportation may be accomplished by an innocent agent of the accused.

Second.  It is next contended in defendant's original brief and in a supplementary brief, recently filed, that the giving of instruction No. 6 was erroneous and prejudicial, for the reason that it changed the theory of the prosecution and amounted to a fatal variance between the allegations charging the defendant himself with the felonious taking of the property by fraud and stealth and portions of the proof, in connection with this instruction, indicating that the property

was taken by an accomplice. The instruction of which complaint is made is as follows:

"You are instructed that if you find from the evidence beyond a reasonable doubt that the witness Sam Foster is guilty of the larceny of the pipe in question, and if you further find from the evidence beyond a reasonable doubt that the defendant in this case aided and abetted or assisted the said Sam Foster in the larceny of the said rope, then and in that event you shall find the defendant guilty of the crime as charged in the information."

Section 2104, R. L. 1910, reads as follows:

"All persons concerned in the commission of crime whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals."

Section 5757, R. L. 1910, provides:

"The distinction between an accessory before the fact and a principal, and between principals in the first and second degree, in cases of felony, is abrogated, and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, must be prosecuted, tried and punished as principals, and no additional facts need be alleged in any indictment or information against such an accessory than are required in an indictment or information against his principal."

The defendant, in support of his claim that there was a variance between the allegations and the proof, changing the state's theory of the case, has cited and quoted a large number of authorities from various states. This court, however, in a number of cases has announced a rule to the contrary, based on the provisions of the statutes above quoted. The accused is entitled to be informed of the nature of the charge against him and of but one charge at a time, but under our

statutes and established practice he cannot insist that he be informed whether he is accused of committing the act alone or in conjunction with others confederating him.

It would be a strained construction to say that instruction No. 6, quoted above, authorized a conviction of either the crime of receiving stolen property or of the crime of larceny, dependent upon the proof adduced, as the case might be. This instruction specifically stated that the jury must find that the defendant aided and abetted the other in the theft. Neither the allegations nor the proof shows that defendant bought this pipe from Foster knowing it to be stolen pipe, but there is proof tending to show that they aided and abetted one another in the original felonious taking of the property.

In the case of Brown v. State, 7 Okla. Cr. 678, 126 Pac. 263, Jay Gould Brown was indicted for the larceny of certain cattle. There was evidence tending to show that two brothers of the accused took the cattle from the owner and that the defendant, with these two brothers, the day following drove the cattle to Lehigh and sold them to a butcher. Held, under the circumstances in this case, that the defendant was not guilty of receiving stolen property, but was guilty of larceny as a principal, in aiding and abetting his brothers in its commission.

The first judicial construction of the statute quoted to which our attention has been called is the case of Pearce v. Territory, 11 Okla. 438, 68 Pac. 504. This case was appealed to the United States Circuit Court of Appeals for the Eighth Circuit, and there affirmed. 118 Fed. 425, 55 C. C. A. 550. The indictment in this case charged the defendant alone with the larceny of a certain top buggy of the value of $90, the property of one Thomas Broyls, and that the property was by with intent to deprive the owner thereof. The testimony of him feloniously taken by fraud and stealth and carried away

fered to sustain the indictment showed that the buggy in question was actually stolen by W. O. Stanley and Alfred French, in Payne county, Okla.; but there was evidence tending to show that prior to the theft of the buggy these men had had a conversation with the defendant, wherein he requested them to steal a buggy and two sets of harness, telling them that if such articles were stolen and brought to him and they would make the price light enough so that it would be a cut between them, he would buy the articles stolen, change the buggy so that it would not be recognized, and conceal the buggy if he was warned at any time that any one had obtained a trace of it. When the buggy in question was actually stolen, it was taken immediately to the defendant and delivered to him in the Osage country, about 75 miles from the place where is was stolen; that at the time of receiving it he promised to pay the thieves $40 and he also promised to change the name on the buggy and to change the dashboard so that it would not be recognized.

In this case it was said:

"The statutes provide that all persons concerned in the commission of a crime, whether they directly commit the act constituting the offense or aid and abet in its commission, though not present, are principals. In view of these statutory provisions, modifying the common law, it is manifest, we think, that the evidence was sufficient to warrant the jury in finding that the defendant was guilty of the offense charged. The testimony tended to establish more than the offense of receiving stolen property; it showed that the defendant requested and counseled others to commit the larceny, and that he shared in the spoils of the crime. Indeed, he was the real instigator of the crime, without whose advice it might not have been committed. In morals, as well as in law, he was as guilty as those who actually laid hands on the stolen property, although he was 75 miles distant from the place where it was taken. He was an accessory before the fact and under our statutes a

principal, and was rightfully indicted, tried and convicted as a principal.''

In the case of Moore v. State, 14 Okla. Cr. 292, 170 Pac. 519, the information charged that Wm. S. Moore committed the crime of unlawfully, willfully, and feloniously selling spirituous liquors to certain minors. The proofs showed that the accused took the money from the boys and that his companion, Echols, delivered the whisky. There was nothing in the information to indicate to the defendant that he was accused of acting in conjunction with others. The court instructed the jury that if they found that these minors purchased this whisky from the defendant, Wm. S. Moore, or from Wm. S. Moore and Joe O. Echols acting together, and that any part of said whisky was delivered to any one of the boys mentioned, then such transaction constituted a sale, justifying a conviction under the information.

In the case of Helms v. State, 14 Okla. Cr. 384, 171 Pac. 340, the information charged George Helms, individually, with selling intoxicating liquors, in violation of the prohibitory law. The testimony was to the effect that certain witnesses bought beer in the defendant's joint at Cardin, Ottawa county, Okla., and that the beer was drawn and passed to them by a man known as ''Cedar Red,'' in the presence of the defendant who owned and operated the joint. The court found the information sufficient. As to the sufficiency of the evidence to sustain the verdict, all persons who take part or engage in an offense are guilty as principals. The evidence showed that the party selling the intoxicating liquor was an employee of the defendant.

In the case of Rhea v. State, 9 Okla. Cr. 220, 131 Pac. 729, the information charged Walter Rhea with stealing three steers from the owner, J. S. Hazelwood. The evidence disclosed that the defendant hired Bob Mitchell and Robey Lovell

to steal cattle; they were to be butchered on defendant's place and the beef sold through the county, and the proceeds were to be divided equally, one-third each. The defendant, in company with Bob Mitchell, went to Weleetka to attend a circus, and on the way back the defendant pointed out to Mitchell some cattle, which he told Mitchell to get that night. On the same day the defendant told Robey Lovell about these cattle. About midnight these two and a brother of the defendant, Rex Rhea, met and drove four head of these cattle out of the pasture. After going about a half mile three head got away. Rex Rhea then went into 'another pasture and drove out three other steers and the three men together drove them to the 'defendant's place, where they were slaughtered and sold from time to time. In the Rhea Case, as in the case here at issue, it was contended that the larceny was complete before the defendant had anything to do with the stolen property and that the testimony only tended to show the defendant to be guilty of receiving stolen property, a crime that could not be established under the information. The court found that under the testimony the defendant was guilty of larceny as an accessory, and that no other facts need be alleged in any indictment or information against an accessory than are required in 'an indictment or information against a principal.

The distinction between principals and accessories has been abolished by statute in 'most of the states, and by section 332 of the Criminal Code of the United States. The provision of the federal statute is as follows:

"Whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal." Act of March 4, 1909 (U. S. Comp. St. § 10506).

It will be observed that the federal statute does not contain a provision that "no additional facts need be 'alleged

in any indictment or information against such an accessory than are required in an indictment or information against his principal." Notwithstanding this difference, the federal courts have held that all persons aiding or abetting in the commission of 'crime are principals, whether the offense was brought about through the medium of others, innocent or guilty, or whether they do it themselves, and that where the act is done by the procurement of a principal it is, in effect, the act of the principal. That an indictment charging an offense is not defective for indefiniteness because it did not specify the names of the persons aiding and abetting in the commission of the crime. Richardson v. U. S., 181 Fed. 1, 104 C. C. A. 69, and other federal cases cited in the opinion.

Section 20 of our Bill of Rights provides that every defendant in a criminal case shall be informed of the nature and cause of the accusation against him. The Legislature has seen fit to abolish the distinction between principals and accessories and has provided that the allegations in either case may be the same. The abolition of the distinction between principal and accessory has never, so far as we know, been held unconstitutional. In our opinion the provision of the statute, "No additional facts need be alleged * * * against such an accessory than are required in an indictment or information against his principal," is not inconsistent with section 20 of the Bill of Rights. It is the duty of courts, whenever possible, to harmonize acts of the Legislature with the Constitution, so that both may be sustained. Ex parte Hunnicutt, 7 Okla. Cr. 222, 123 Pac. 179, and the cases there cited.

Third. It is further contended that there was reversible error growing out of the conduct of the county attorney in his examination of witnesses and in his argument to the jury. Defendant objected particularly to questions propounded to witness Mosby, as follows:

"You haven't any very friendly feeling towards this man that stole your pipe?"

"You haven't any very friendly feeling towards a man that after an investigation, and after a preliminary hearing, you believe stole your pipe, have you?"

While we do not feel justified in placing our stamp of approval upon this character of questions, it must have been apparent to the jury that the county attorney, unlike the court, is to some extent a partisan, representing the state. The jury had no right to assume, and probably did not assume, that the defendant was guilty because of the questions propounded by the county attorney, or because the county attorney believed him guilty.

With reference to the comment made by the county attorney, calling the jury's attention to the fact that the defendant was a Jew, it is fair to assume from the record that these remarks were in reply to references to his nationality made by his own counsel. For some reason unknown to this court the argument of the county attorney only appears in the record. From the introductory remarks of the county attorney it appears that he was answering the argument made by defendant's counsel. It has been frequently held by this court that counsel for defendant cannot provoke an argument and by his own misconduct bring error into the record, and then take advantage of it. By this we do not mean to hold that the remarks made by counsel for the state in this case, if unprovoked, were prejudicial. The statement complained of was, in effect, that it made no difference whether the person charged was a Jew or a Gentile, Catholic or Protestant, or what his religious preferences might be. However, such discussions might well be eliminated from all arguments to juries.

The court repeatedly admonished the jury that they were to consider the evidence only and that they should pay no at-

tention to the oratorical flourishes or remarks of counsel not supported by the evidence.

For the reasons stated in this opinion the judgment of the trial court is affirmed.

DOYLE, P. J., and MATSON, J., concur.