### C. G. WERTZBERGER v. STATE.

No. A-4010.  Opinion Filed Oct. 6, 1923.
(218 Pac. 721.)

(Syllabus.)

1. **Indictment and Information—Allegations Against Common-Law Accessory Before Fact.** Under the terms of section 2574, Comp. Stat. 1921, no additional facts need be alleged against one who at common law was deemed an accessory before the fact than would be necessary as against the principal.

2. **Same—Conviction Sustained on Charge Against Individual by Proof that He Committed Crime With Aid of Others.** Ordinarily a conviction will be sustained when based upon an information charging an individual with the commission of an offense where the proof shows that the crime was accomplished by the person charged with the aid of others confederating with him, if such charge be not misleading and fairly informs the accused of the nature of the offense charged and the circumstances necessary to constitute the offense.

3. **Larceny—Evidence When Circumstantial Evidence Sufficient to Sustain Conviction.** Where the evidence is entirely circumstantial, or circumstantial so far as it implicates the accused with the actual commission of the crime, the circumstances proved must be consistent with and point to the guilt of the accused, and must be inconsistent with his innocence.

    (a) By this test, we think the findings of the jury in this case were supported by sufficient evidence.

4. **Evidence—Testimony of Accomplice in Grand Larceny Sufficiently Corroborated.** The testimony of the chief witness for the state, if he was an accomplice, must be corroborated by independent testimony. Whether or not he was an accomplice is not positively shown in this case. In any event, the record indicates that there was sufficient supporting testimony corroborating this witness.

Appeal from District Court, Payne County; Chas. C. Smith, Judge.

C. G. Wertzberger was convicted of grand larceny, and he appeals. Affirmed.

R. B. Thompson, John P. Hickam, Thos. H. Owen, and Alvin F. Molony, for plaintiff in error.

Geo. F. Short, Atty. Gen., R. E. Wood, Asst. Atty. Gen., and C. C. Suman, Co. Atty., of Stillwater, for the State.

BESSEY, J. C. G. Wertzberger, plaintiff in error, in this opinion referred to as the defendant, was by a verdict of the jury, rendered December 9, 1920, found guilty of grand larceny, as charged in the information, and by the judgment of the court rendered upon the verdict his punishment was fixed at confinement in the state penitentiary at McAlester for a term of three years. From the judgment so rendered he appeals.

The evidence in this record shows that the defendant had been a resident of Sapulpa, Creek county, for a number of years; that for two years next preceding the trial his business had been that of oil well driller; prior to that time he had been commissioner of finance of the city of Sapulpa, and had been engaged in various other occupations; and that he bore the reputation in that community of being a truthful, law-abiding citizen; that two or three weeks before the Bank of Glencoe, in Payne county, about 50 miles distant from Sapulpa, was burglarized and robbed of about $19,000 worth of government bonds, which were taken from the bank vaults, the defendant made certain inquiries of others, seeking to arrange a market for Liberty bonds which he said he was expecting soon to acquire. The bank was robbed on the night of June 30, 1919,

and there is testimony tending to show that the defendant was in possession of a large portion of the bonds taken therefrom on the next two succeeding days, and that the defendant assisted in the asporation of the stolen bonds by carrying $2,500 worth of these bonds to Tulsa, where they were converted into money for the purpose of appropriating it to the defendant's use and benefit. There is evidence supporting the state's theory that the defendant knew that these were stolen or "wet" bonds. Later, on the 10th day of July, 1919, bonds to the amount of $7,500 were taken by the defendant and Frank Gilbert to Tulsa and converted into cash. All of these bonds were subsequently traced by number and shown to be some of the bonds that had been taken from the Glencoe bank on June 30th. The evidence raised a suspicion that Gilbert was, or may have been, an accomplice or an accessory after the fact.

It was the theory of the state that the robbery of the bank had been planned and executed by the defendant and other unknown parties. The amended information charged that the defendant "in the county of Payne did then and there, willfully, unlawfully, and feloniously, by stealth and fraud, take, steal, and carry away certain United States bonds," describing them in detail. There was no averment in the information implicating others in the theft or asportation of the stolen bonds. There was no direct testimony connecting the defendant with the burglarizing of the bank, excepting the circumstantial evidence indicating that the defendant was in possession of a large portion of the bonds the day following the robbery, and on subsequent days, and that he converted these bonds into cash for his own use and benefit under circumstances indicating that he was, or may have been, implicated in the original taking. The condition of the bank when the robbery was discovered the next morning indicated that probably

more than one person broke into the bank and carried away the bonds. It was the theory of the state that the defendant was one of the coconspirators who acted conjointly in the original taking.

Defendant took the stand in his own behalf and denied that prior to the robbery he had made inquiry from Gilbert or any other person about the sale of bonds he was expecting to acquire. He stated that in January, 1919, he sold Gilbert some bonds, amounting to $1,000, more or less. He admitted that about 10 days after the robbery he went from Sapulpa to Tulsa with Gilbert in an automobile, and that Gilbert had a package of United States bonds, but that they did not belong to him (the defendant) and that he never claimed any interest in them; that defendant was asked by Gilbert on the way to Tulsa if he had any bonds for sale, and that the defendant replied that he had none at the time, but was figuring on getting some, a small amount in payment for a shack he was about to sell, and that he afterwards had a conversation with Gilbert in his office concerning these bonds, and had one or more conversations over the telephone.

Private detectives and a post office inspector planted a dictograph in the office of Gilbert and also installed an extension telephone connecting with an adjoining room, where the detective concealed himself and listened to conversations had between Gilbert and the defendant. These conversations to some degree corroborated the theory of the state that the defendant had been dealing in stolen bonds, and also to a certain extent corroborate the testimony of Gilbert as to defendant's transaction with the bonds here in question.

The chief reasons urged by the defendant why the judgment of the trial court should be reversed are three in number, as follows:

(1) A variance between the proof and the allegations in the information, in that the information charged the defendant alone with committing the crime, while the proof disclosed that the crime must have been committed by conspirators, acting together.

(2) That Gilbert, the principal witness for the state, was an accomplice, and that the state's evidence tending to implicate the defendant was not sufficiently corroborated by evidence independent of the testimony of the accomplice.

(3) That the conviction of the defendant was based upon circumstantial evidence, amounting at most to a suspicion only, and that it did not preclude every other reasonable hypothesis than the guilt of the defendant.

Section 1521, Comp. Stat. 1921, provides:

"All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals."

Section 2574, Id., reads thus:

"The distinction between an accessory before the fact and a principal, and between principals in the first and second degree, in cases of felony, is abrogated, and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, must be prosecuted, tried and punished as principals, and no additional facts need be alleged in any indictment or information against such an accessory than are required in an indictment or information against his principal."

This court has heretofore held that no additional facts need be alleged in an information against one who at common law was deemed an accessory before the fact than

would be necessary as against the principal.  Pearce v. Ter., 11 Okla. 438, 68 Pac. 504; Id. on appeal, 118 Fed. 425, 55 C. C. A. 550; Moore v. State, 14 Okla. Cr. 292, 170 Pac. 519; Rhea v. State, 9 Okla. Cr. 220, 131 Pac. 729.

In Sanditen v. State, 22 Okla. Cr. 14, 208 Pac. 1040, it was held that the provision of our statute that no additional facts need be alleged in an information against an accessory than ,would be required against the principal is not inconsistent with section 20 of the Bill of Rights, providing that an accused shall be informed of the nature and cause of the accusation against him.  We see no reason to recede from this rule, and we hold the information here sufficient, although it contained no mention of any confederate who may have assisted in the commission of the offense.

Gilbert may have been an accomplice in the commission of the crime, or he may have been an accessory after the fact.  Certain it is that he helped to dispose of the stolen bonds, knowing that they were stolen.  This prosecution rests almost entirely on the testimony and confessions of Gilbert, with almost no corroboration except that of the detective Bays, who listened in on certain telephone and dictograph conversations between Gilbert and the defendant.

Quoting from the record:

"Q. Describe the (extension) telephone conversation. A. Mr. Gilbert called up Mr. Wertzberger—well, asked him about the bonds that he was to bring him there—and Mr. Wertzberger told him he had sent them back; the man was out of town and he wouldn't get to see him for a day or two, didn't know just when; but as soon as the man returned he would get the bonds and bring them up to him.

"Q. How do you know that Wertzberger said that? A. Mr. Gilbert called his number and asked if it was Mr. Wertzberger, and he said it was.

"Q. How do you know that it was Mr. Wertzberger, how did you hear Wertzberger's part of the conversation? A. It was an extension telephone.

"Q. Explain to the jury about that. A. It is a telephone in an adjoining room on the same line of the telephone used from Burnett's office. They had two phones, one in one room and one in the other, both on the same line. * * *

"Q. Go ahead and tell what the (dictograph) conversation was. A. The first question Gilbert asked Wertzberger when they entered the room was, 'What did you do with the bonds?' Wertzberger answers, 'I sent them back.' Gilbert, 'What about the registered bonds?' Wertzberger, 'They destroyed them.' Gilbert, 'Well, do you think you can get them again?' Wertzberger, 'Yes; I see the fellow every day or two.' Gilbert, 'What about the war savings stamps?' Wertzberger, 'I don't remember anything about any war savings stamps.' Gilbert, 'Have you seen Bays?' Wertzberger, 'No; I don't know him.' Gilbert, 'I saw him, and he looked as if everything was off. When can you get them up here again?' Wertzberger, 'I will try and get them this evening,' Gilbert, 'I took $15,000 worth over to Houston and Fible, with Jim Berry, and they never said a word, and I think I can handle these all right now.' Wertzberger, 'Well, there is lots of people buying bonds, and there is no danger of these, for they never came from Oklahoma. This fellow told me they didn't. I don't want to get mixed up in the G—— d—— thing, so I sent them back. Frank, you know good and well they couldn't have got those bonds without some inside help, and another thing, they didn't get no money.' Gilbert, 'How many are left?' Wertzberger, '$5,000 worth.' Gilbert, 'Well, there ought to be more than that, because you only brought up $10,000 and there was $18,000 stole. I thought they were going to arrest Crawford and I and sue us.' Wertzberger, 'Oh, h——, they can't do a d—— thing, for those bonds never came from Oklahoma at all, and you never saw the fellow before in your life. You know how to give the other fellow's description, and you never saw him before.' Gilbert, 'How are you getting along with

your well?' Wertzberger, 'O, I am having a lot of bad luck. I hope to get a good well, as I have a fourth interest in that 40.' * * *

"Q. Tell the court and jury what that (telephone) conversation was. A. Gilbert called Wertzberger and asked him what he had done, and Wertzberger said, 'That fellow hasn't come in yet.' Frank says, 'Isn't there any way you can get hold of him?'. Wertzberger says, 'No; I just have to wait, but as soon as he comes in I will call you.' That was the second (telephone) conversation."

Without further recitations from the evidence, we hold that the testimony of the accomplice Gilbert (if he was an accomplice) was sufficiently corroborated. The dictograph and extension telephone conversations to some degree corroborated the story told by Gilbert on the stand. True, no single fact or circumstance corroborated Gilbert conclusively, but there were a number of corroboratory circumstances, here a little and there a little, so that in the aggregate they justified the jury in concluding that Gilbert's story was in the main correct and tended to connect the defendant with the commission of the larceny under the rule prescribed in section 2701, Comp. Stat. 1921, and as defined by this court in cases cited in the annotations thereto.

It is settled in this state that when the evidence relied upon to sustain a conviction in a criminal case is entirely circumstantial, the circumstances tending to show guilt must be consistent the one with the other, and must point so strongly to the guilt of the accused as to exclude every other reasonable hypothesis than that of guilt.

The evidence implicating the defendant in the taking was wholly circumstantial, but the evidence indicative of the disposal of the bonds by the defendant was not altogether circumstantial, in the ordinary acceptation of the term.

Critically speaking, almost every incident or act may be termed a circumstance, and all evidence relating thereto might be termed circumstantial. But this and other courts have adopted a more liberal definition. Circumstantial evidence is the proof of certain facts and circumstances from which a jury may infer other connected facts which usually and reasonably follow, according to the common experience and observation of mankind; proof of collateral facts having some connection, direct or remote, with the main fact in controversy. 2 Words and Phrases, First Series, p. 1161, and citations. The facts and circumstances proved must be consistent with and point to the guilt of the accused, and they must be inconsistent with his innocence. Ex parte Jefferies, 7 Okla. Cr. 544, 124 Pac. 924, 41 L. R. A. (N. S.) 749.

By direct evidence in this case it was shown that numerous bonds, specifically described and numbered, were stolen from the Bank of Glencoe and there was evidence, direct and circumstantial, tending to show that the defendant disposed of some of these identical bonds soon afterwards—some of them the day after the robbery—indicating that he was directly implicated in the original taking and was not merely a receiver of stolen property. The conversations heard over the extension telephone and the dictograph indicate that the defendant disposed of stolen bonds, knowing them to have been stolen. It is not necessary that the corroborating circumstances alone should point conclusively to the guilt of the accused; it is sufficient if the circumstances proved, in connection with the direct and positive facts in evidence, point to the guilt of the accused and exclude every reasonable inference of innocence; and, where the positive facts shown are by the statements of an accomplice such facts must be substantially corroborated by other evidence, direct or circumstantial.

Measured by the above tests we think the verdict of the jury was supported by sufficient evidence, and, so holding, the judgment of the trial court should be affirmed; and it is so ordered.

MATSON, P. J., and DOYLE, J., concur.