# FLOYD GIBSON v. STATE.

No. A-6818. Opinion Filed Nov. 30, 1929.
Rehearing Denied Jan. 4, 1930.
(283 Pac. 790.)

Darnell & LaRue, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error, hereinafter called the defendant, was by information charged jointly with Elmer Ridenhour, Jake Furnish, Curt Pollett, and Minnie Williamson, with the crime of assault with intent to commit rape. The defendant, Floyd Gibson, was tried separately and found guilty, and his punishment fixed at confinement in the state penitentiary for five years, term to begin at the date of the delivery of the defendant to the warden of the state penitentiary. Motion for new trial was filed, considered, and overruled, and the case appealed to this court.

The testimony on behalf of the state shows: That on the evening of the alleged offense, which was the 9th of May, 1926, all the defendants excepting Minnie Williamson were residents of Thomas, Okla. They came to Weatherford that Sunday in a one-seated Ford car belonging to this defendant, and brought a jug of whisky or home brew with them and hid it on the outskirts of Weatherford. After they got to town, the defendant and Elmer Ridenhour got Minnie Williamson and went to the home of Rita Marical, and pursuaded Rita to take a ride with them, on the promise of taking her to church that evening. All the parties got into defendant's car and started out on the road north of town. They had not gone very far until Elmer pulled Rita off the lap of Minnie Williamson over on his lap. Gibson laughed and turned off on a lonely road. When Ridenhour was attacking Rita, she called for help, but did not get it.

"I asked Gibson to help me and he just laughed. Gibson took me by the hand when I was struggling to get away from Ridenhour."

The record shows that, after Rita Marical got away from Ridenhour, she ran back up the road, and the defendant took Ridenhour in his car and followed Rita and

stopped the car when they had overtaken her, and there let Ridenhour out of the car and Ridenhour renewed his attack upon Rita the second time. Rita escaped from Ridenhour after choking him into unconsciousness and started back through the plowed fields to Weatherford, and reached the garage at her father's house when she was again met by this defendant, Jake Furnish, and Minnie Williamson, all riding in defendant's car.

The prosecuting witness further testified: That Minnie Williamson got out of the car and came running toward her; Jake Furnish got out of the car also. They stood there in the corner of the yard and talked a while—

"The car was near me and they talked loud enough that I could hear what they said. Floyd Gibson was in the car when they were talking to me. They wanted me to go with them. Jake Furnish promised to protect me, and promised to bring me right back if I would show them where Elmer Ridenhour was. You see, I refused at first and said, 'No, he is out there where I killed him, at the side of the road;' and they said he was not there. I did not tell them on which side of the road I left him; after they made the promises they did I went with them. Floyd Gibson, Jake Furnish, and Minnie Williamson and myself were in the car. I was riding partly on Minnie's lap and partly on Jake's; we went the distance of about a block when we saw Curt Pollett. I was holding my head in my hands and raised up just as they spoke to him and stopped the car. My back was to the steering wheel. I turned around and saw him getting over the fence carrying a jug. He handed the jug to Floyd Gibson and he turned it up, and handed it to Jake Furnish. I don't know whether there was anything in it or not. They offered the jug to me and I told them I did not drink. We then started down the road to the place where I told them I had left Elmer. This is the first time I had seen Pollett that evening. When we got back to the place where I left Ridenhour, he was on the inside of the fence

leaning on a post. Floyd Gibson was driving the car. When the car stopped Ridenhour crawled over the fence, and I heard him say he was freezing to death. He got on the fender of the car. He was in his shirt sleeves. Floyd Gibson drove on, and I began pleading with them to take me home. Floyd Gibson said he was just going up to the corner and would take me home. They did not turn back and take me home as they promised. I asked the defendant why he was going that way, and he said he was going around the other section line and take me back, but he stopped again near the place where he had stopped the car before. They all got out except Jake Furnish and myself; and Floyd Gibson, Minnie Williamson, Curt Pollett, and Elmer Ridenhour went probably as far as (indicating) from the car and stopped there in a crowd, I would say five or six feet from the car. I saw Floyd Gibson fall to the ground, or anyway I saw his form go down. I saw Minnie Williamson stoop down and help him up. Jake Furnish was trying to pursuade me to get out of the car. He told me he wanted to tell me something. Jake Furnish pulled me out of the car and pulled me a few feet from the car, probably ten feet, and pulled me over to a bank on the right side of the road, and when he began to get me down I screamed. I began to call for Minnie to help me. About that time Curt Pollett and Elmer Ridenhour came up and Jake asked these boys to help him, telling them to hold my hands and feet. Elmer was on one side and had hold of one hand and one foot, and Curt Pollett was on the other side, and he said, 'Now you hold her while I get her bloomers down,' and he moved me over and said, 'Pull them down on that side.' He had just succeeded in getting that far, and his head was holding my head down, when it seemed as though his cheek was right near my mouth and I bit him on the cheek. About this time I saw this light come over the hill. My skirts were up to my waist, I was trying to prevent them from hurting me; I used every effort. I screamed and I prayed to the Lord for help; and asked Minnie to help me. The defendant did not do anything to assist me while I was praying for help. He did not take hold of the other parties or offer

to stop them. After they had hold of my feet I could not do anything further. The last thing I did was to bite Curt Pollett. A car light flashed over the hill, and they began to turn loose and drag me up and pulled me over the fence. I was screaming for help, and the men were using profane and obscene language, and they told me if I did not be still they would choke me to death. I said, 'Minnie please help me;' that is part of it. Minnie was only a few feet from me, but she did not render any assistance. The parties in the car that came to my assistance were Mr. Griffis and Mr. Barton, and Mrs. Barton and two children. When I saw the car light I hollowed, 'Help, please help me.' Jake Furnish stayed with me until the last minute; the other two had already run over in the field, and then Furnish turned me loose and ran too. I then begun to struggle toward the fence. Mr. Griffis and Mr. Barton put me in the car and took me back to Weatherford."

Ira W. Griffis and George W. Barton corroborated the prosecuting witness as to the statement that while on the highway they heard some one screaming and drove the car down to where she was, and when the car drove up and stopped near the car of the defendant they heard parties running off through the wheat field, and the prosecuting witness came to the fence with her face bruised and her clothing disarranged and so weak she could hardly walk. The witnesses Mr. Griffis and Mr. Barton placed the girl in Barton's car and drove her to her father's home.

The testimony of the state further tends to show that later on in the evening the parties were found near the edge of the town of Weatherford with their car lights turned off, the car tag taken off and in the back of the car; that some of them were arrested there and others ran; and that, while they were trying to arrest the ones that were driving, the driver of the car, this defendant, turned the motor on and drove hurriedly away; all

of the defendants were later arrested and a preliminary held, and the defendants were held for trial.

At the close of the state's testimony, the defendant demurred to the evidence, on the ground that it was not sufficient to connect the defendant with the offense.

Minnie Williamson was called as a witness on behalf of the defendant, and detailed, in substance, the going to the home of the prosecuting witness and getting her to go out riding in defendant's car, stating: That, when they started out Floyd Gibson was driving and she was sitting in the center of the car, Elmer Ridenhour was next to her, and—

"Rita was sitting on my lap. After we started, Rita set on Elmer's lap. I don't know how she came to set on his lap; she made a fuss about it. I did not see the defendant, Floyd Gibson, do anything to her, or hold her while I was out there. I did not see anybody try to rape Rita Marical on the first trip out there; we had a fuss was all. I don't know what she and Elmer were fussing about. Floyd was sitting under the wheel. I don't remember Floyd catching her hair in his shirt sleeve. He had his arm on the back of the seat. I told Elmer and Rita two or three times to quit fussing and behave themselves. We went back to town without them. When we got out of the car the first time, I did not say anything to her about coming back. I did not know where she went; when she got out she ran off and left the car; that is all I know. Neither Rita Marical or Elmer Ridenhour came back to town with us on the first trip. We met Curt Pollett and Jake Furnish. The defendant, Floyd Gibson, and I asked them if they had seen Elmer, and they said they had not. We started back to hunt for Elmer. Curt Pollett was driving Floyd Gibson's car When we started back we went up to Rita's home. We saw her right at the garage. We got her in the car and drove back to find Elmer. We went back on the second trip close to the place we first were that evening. We

found Elmer. He wanted his coat and said he was cold, and asked about his hat, and we drove back to the place where they had been before to get his hat. Elmer was the one suggested looking for his hat. Curt Pollett drove us to the place where we went to look for the hat. We all got out of the car. It was dark then. Curt Pollett and Elmer Ridenhour was looking for his hat. Floyd Gibson and I were just standing there, and Jake Furnish and Rita left the car. The defendant did not touch Rita in any way. The boys got something to drink, I don't know what it was, before we found Elmer Ridenhour. I don't remember Rita making any complaint about us taking her home. It was stated in her presence what we were going up the road for."

On cross-examination, the witness stated:

"Nothing unusual took place that I know of. I never saw Jake Furnish do anything wrong toward Rita, nor did I see Pollett do anything wrong. I don't remember Rita saying about going to church that night. I heard somebody hollow, but I did not know they hollowed for help."

The testimony of the witness Minnie Williamson tends to show that she did not know anything wrong was going on there the first or the second trip they made out to the place where the offense is alleged to have been committed. She admits she pursuaded the prosecuting witness to go out there, and she admits she heard some one hollow. She also admits that each trip she got the prosecuting witness to go out with them the defendant in this case drove the car, and that it was his car they were using; that when they went out the last time the witness, defendant, Pollett, and Ridenhour got out and left Furnish and the prosecuting witness in the car, and finally the prosecuting witness got out.

There is no denial on the part of the witness that Mr. Griffis and Mr. Barton and his family came to the rescue

of Rita Marical, and that the parties ran off and left the girl there. The defendant in his own behalf testified, in substance, to what is detailed by the prosecuting witness on the first trip, but tries to show that, when Ridenhour was taking liberties with the person of the prosecuting witness, a button of his shirt caught in Rita's hair, and that is the reason why he held her hands. He admits they drove away and left the prosecuting witness out in the country with Ridenhour and went back to town and got Furnish and Pollett and a jug which they brought with them from Weatherford. They afterwards saw the prosecuting witness at the garage near her home, and Minnie Williamson went and talked to her and they persuaded her to go back with them and help find Ridenhour, whom the prosecuting witness thought she had choked to death. They all went back in the car, and defendant admits they drove from place to place and finally found Ridenhour, and drove back to where Ridenhour had originally taken the prosecuting witness out of the car; he then claimed he got out of the car, and that later the prosecuting witness and Furnish got out of the car. He admits they were all there together; and he admits some one hollowed, but he did not know who it was hollowing for help. He also admits that Mr. Griffis and Mr. Barton rescued the girl and that the men ran off. He admits that when next seen he was in town in company with Furnish, Ridenhour, Pollett, and Minnie Williamson; that, when the officers came up, some of them ran off, and the first chance he had he started the motor and ran off in his car and was finally arrested.

Pollett testified, in substance, the same as Minnie Williamson and the defendant. There is no dispute that there was an attempt to rape the prosecuting witness; that all the parties were there; that the defendant assisted

on both occasions in getting the prosecuting witness out to the place where the offense is alleged to have been attempted; that he did nothing to rescue her, but was present with the crowd he had brought out there until the girl was rescued by Mr. Griffis and Mr. Barton.

This is all the testimony it is deemed necessary to set out for the purpose of reaching an opinion in this case.

The defendant assigns six errors alleged to have been committed in the trial of the case; the first being that the court erred in overruling defendant's motion for a new trial. Second, the court erred in overruling the defendant's demurrer to the information; the defendant contending that the court erred in not sustaining his demurrer to the information, contending further, there are no allegations in the information that in any wise advise the defendant of the facts he would be called upon to meet. An examination of the information shows that this defendant, with the other defendants named in this opinion, were jointly charged with the crime of assault with intent to commit rape. Under our statute, we hold, the information stated sufficient facts to put the defendant on his notice of the charge that he was expected to meet. Where the defendant is jointly charged with others in the commission of a crime, it is not necessary to allege a conspiracy or to allege in detail all the facts the state expects to prove. It is sufficient to charge them with the crime set out and described in the information. Wertzberger v. State, 25 Okla. Cr. 1, 218 Pac. 721; Dickson v. State, 26 Okla. Cr. 403, 224 Pac. 723. The court did not err in overruling the demurrer of the defendant to the information.

The defendant next contends that the court erred in overruling his motion for a new trial, in admitting evi-

dence incompetent, irrelevant, and prejudicial to the rights of the defendant, and improperly instructing the jury as to the law in his case. All of these assignments are embraced within the assignment that the court erred in overruling the defendant's motion for a new trial.

The record in this case discloses an unusual condition. Two men and a woman go to the home of the prosecuting witness and invite her to get in the car and go with them for a drive, and, as she says, they would get her back in time to go to church. They drove out the road a distance when one of the men, Elmer Ridenhour, began to make advances toward the prosecuting witness. After the car had been driven off the main highway into a cross section road, the defendant in this case and Minnie Williamson left the prosecuting witness and Ridenhour out on this road in the country. Later it appears they were watching and saw the prosecuting witness near the garage at her father's home, where they approached her and asked her where Ridenhour was, and they say the prosecuting witness told them she thought she had killed him. They did not go back and hunt for Ridenhour, but induced the prosecuting witness to again get in the car and go with them. After the defendant and Minnie Williamson, with Rita Marical in the car, had driven some distance, they came upon Jake Furnish and Curt Pollett. Furnish got in the car, and Pollett on the running-board; Pollett had a jug of whisky or some kind of a drink which he passed to the defendant and to Furnish, and they turned it up as if drinking. They tried to get the prosecuting witness to drink, and she refused. They then drove back down the road a piece and found Ridenhour. They claim Ridenhour wanted to go hunt his hat. Ridenhour gets on the running-board of the car, and they all drive back to the place where they had driven on the first trip. The

defendant, Minnie Williamson, Ridenhour, and Pollett got out of the car, leaving Jake Furnish and Rita Marical in the car. Later the prosecuting witness got out of the car and so did Furnish. The defendant and Minnie Williamson say they did not know anything wrong was being attempted on the person of Rita Marical, but the testimony of the minister of the Gospel, Mr. Griffis, and Mr. Barton is to the effect they heard the screams of the girl and went to her rescue, and, when they got there, they heard other parties running away from the scene where Rita was. They took her home.

The defendant denies any knowledge of any intention of Ridenhour, Furnish, or Pollett to attempt to rape the prosecuting witness. In considering the question of his guilt or innocence, it is necessary to consider his actions at the time the screams were heard, when the witnesses Griffis and Barton came to the rescue of the girl, and the parties ran from the scene.

The record discloses that, from the time the defendant and other parties appeared in the town of Weatherford, he was in the car driving them from place to place, and on all occasions he was in the car and was near enough to know what was going on. His actions clearly indicate that he did not desire to interfere, and that he refused, both in the car and out of the car, to prevent the parties that were assaulting the prosecuting witness from carrying out whatever purpose they had in mind, and that, when appealed to by the prosecuting witness, he laughed and stood by, notwithstanding her screams were loud enough to be heard quite a distance away by the prosecuting witnesses Griffis and Barton.

The record in this case is sufficient to warrant the jury in convicting Pollett of an attempt to commit rape.

The question then to be determined in this case is, Is the testimony sufficient to show that this defendant, by his action or words, aided, abetted, or assisted the other parties to attempt to carry out their purpose? The defendant contends that the facts and circumstances are consistent with his innocence, and that the trial court should have instructed the jury to return a verdict in his favor, and that the verdict is not supported by sufficient evidence. All of the facts and circumstances indicate the defendant was assisting in getting the prosecuting witness out in the country, and was present on all occasions when she was driven out the road, and that he did everything he could to give Ridenhour, Pollett, and Furnish an opportunity to commit the crime that was attempted on the prosecuting witness. The fact that this defendant did not go to the prosecuting witness when she screamed is a circumstance strongly indicating that the defendant knew what was going to be attempted, and his failure to assist her when she appealed to him and continued to scream clearly indicate that he knew what the other parties were attempting to do to the prosecuting witness.

In Blanck v. State, 14 Okla. Cr. 339, 169 Pac. 1130, 1132, this court said:

"This court has repeatedly held that the least degree of concert of action or collusion makes the act of one conspirator the act of all, and each conspirator is liable for the act of each other conspirator done in pursuance of such conspiracy."

We hold that the evidence was sufficient to warrant the court in submitting the case to the jury. The defendant further contends that the court committed an error of law in its instructions to the jury, and in refusing to give certain requested instructions by the defend-

424

ant. After a careful study of the instructions given by the court, we hold they correctly state the law applicable to the facts contained in the record, and for this reason the court did not err in refusing to give the instructions requested by the defendant. The instructions requested by the defendant are substantially covered by the instructions given by the court, and the refusing of the court to give the requested instructions did not prejudice the rights of the defendant. Brown v. State, 42 Okla. Cr. 11, 273 Pac. 1018.

The evidence is sufficient to sustain the verdict. The instructions were fair to this defendant and substantially stated the law. Finding no prejudicial errors in the record, the judgment is affirmed.

EDWARDS, P. J., and CHAPPELL, J., concur.