MAXWELL, JUSTICE, FOR THE COURT:
 

 ¶ 1. In 2011, Robert Patrick Terrell-through his middleman Archie Nicholson-recruited Ricardo L. Hawthorne to record forged property deeds purporting to convey John McLendon's property to Hawthorne. Terrell and his coconspirators then used the forged deeds to fraudulently induce a timber company to buy the timber rights for $20,300 and, unbeknownst to McLendon, harvest his timber. A jury found Terrell guilty of timber theft, conspiracy
 to commit timber theft, false pretenses, and conspiracy to commit false pretenses.
 

 ¶ 2. Because the evidence was sufficient to convict Terrell of both timber theft and false pretenses, we affirm those convictions and sentences. However, we agree with Terrell that the evidence supported only one conspiracy between Terrell, Nicholson, and Hawthorne, not two. We therefore vacate his two conspiracy sentences and remand the two conspiracy convictions to the trial court with instructions to dismiss-at the State's election-one of the conspiracy counts and resentence Terrell on the remaining conspiracy count.
 

 Background Facts and Procedural History
 

 I. Indictment
 

 ¶ 3. In March 2013, a grand jury returned a twenty-count indictment against Terrell, Nicholson, and Hawthorne. The charges stemmed from their scheme to "sell" the timber on McClendon's property to Brushy Creek Timber Company. The State charged that Terrell, who worked in the timber industry and was familiar with property deeds, with Nicholson as the go-between, recruited Hawthorne to record forged warranty deeds purporting to convey McLendon's family property to Hawthorne. Hawthorne then sold these fraudulently obtained timber rights to the property to Brushy Creek for $20,300. Brushy Creek, which had no idea the timber deed was forged, then harvested and sold McLendon's timber.
 

 II. Trial
 

 ¶ 4. Only Terrell was tried. At the beginning of trial, the State dismissed sixteen counts and proceeded to trial on the remaining four counts-(1) timber theft, (2) conspiracy to commit timber theft, (3) false pretenses, and (4) conspiracy to commit false pretenses.
 

 A. The State's Evidence
 

 1. Investigators
 

 ¶ 5. The State's first witness was State Trooper Demetrius Hawthorne (no relation to Ricardo Hawthorne). In 2011, Hawthorne was a deputy sheriff in Jefferson Davis County. On May 28, 2011, McLendon reported to the sheriff's office that someone had been harvesting timber on his family's property. After visiting McLendon's property himself and seeing the large equipment and cut timber, Deputy Hawthorne contacted the Department of Agriculture.
 

 ¶ 6. Chris Newman, an investigator with the Department of Agriculture, also testified. Newman's investigation revealed two recorded deeds-one from John McLendon and one from Clarence McLendon-both conveying property to Ricardo Hawthorne. Newman also found a third warranty timber deed conveying Hawthorne's timber rights to Brushy Creek.
 

 ¶ 7. Newman showed the deeds to John McLendon, who maintained he never signed them. With the recorded deeds were two affidavits of heirship. One affidavit was from someone named John Smith, who claimed to have known A.C. McLendon. According to Smith, A.C. had died and left as his sole heirs John McLendon and Clarence McLendon. The other affidavit was from someone named Ray Rodgers. Rodgers's affidavit claimed he had known Ellawese McLendon and that she had died, leaving as her sole heirs John McLendon and Clarence McLendon. But Newman's investigation revealed this claim was false. In truth, Ellawese was still alive. In fact, Newman had talked to her the morning of trial. Newman also discovered that Clarence McLendon did not exist.
 

 ¶ 8. Newman ultimately approached Ricardo Hawthorne about the bogus documents.
 

 And Hawthorne confessed to forging them. Hawthorne explained that Terrell and Nicholson were also part of the scheme.
 

 2. Victims
 

 ¶ 9. McLendon's testimony corroborated Newman's. He clarified that Ellawese was his wife of fifty years, not his mother, and that she was still alive and quite spry for her age. And he had never heard of Ray Rodgers, John Smith, or his purported brother, Clarence.
 
 [1]
 
 John McLendon never signed the warranty deed claiming to transfer his property to Hawthorne, which did not even list his correct phone number. In fact, the first time he ever met Hawthorne was in the sheriff's office, after the investigation started.
 

 ¶ 10. But McLendon did know Terrell. Terrell had approached McLendon in 2007 about buying some timber. McLendon said he had agreed to help Terrell out by selling below "cruise" price. After Terrell drafted a contract, a man who McLendon assumed was Terrell's business partner, Isaac Haynes, wrote McLendon a check for $20,000. The check bounced. And the deal fell through. After that, McLendon refused to have any further dealings with Terrell.
 

 ¶ 11. The State also called representatives of Brushy Creek. In April 2011, forester Robert Newsome worked for Brushy Creek. Part of his job was to locate property owners willing to sell timber. If he found an interested owner, Newsome would "cruise" the owner's property to evaluate the timber for purchasing. Newsome testified he had talked to Terrell several times about the Hawthorne deal. "[Terrell] would call me to know what the hold up was on the money issue and stuff like that."
 

 ¶ 12. Randy Davis owned Brushy Creek. He testified someone had called Brushy Creek's office about some prospective timber property. Davis had Newsome follow up with the lead. Newsome met someone at the land located between Joe Griffith Road and Hammond Road-where McLendon's property is located. Newsome told Davis the timber looked good. So Davis went out there and met with Hawthorne and another unidentified man.
 

 ¶ 13. Hawthorne told Davis he had inherited the land "from his grandfather or something." Davis "cruised" the timber and offered $20,300. Hawthorne accepted. Hawthorne then hired an attorney to issue a title opinion. Based on this opinion, which relied on the forged deeds, Brushy Creek wrote Hawthorne a $20,300 check. Then, based on its contract with Hawthorne, Brushy Creek harvested the timber. Davis testified Brushy Creek sold the timber for a profit.
 

 3. Coconspirators
 

 ¶ 14. Terrell's coconspirators were also called. Nicholson testified that he had worked for Terrell since 2005, taking down trees after Hurricane Katrina. At first, Nicholson said Hawthorne had approached him about needing some work, so Nicholson introduced Hawthorne to Terrell. But then the State confronted him with his prior statement he had given to Newman. At that point, Nicholson admitted that it was Terrell who had asked him if he knew anyone who would be willing to sign some deeds. So Nicholson called Hawthorne, who agreed to forge and record the bogus deeds for Terrell. Nicholson also took Hawthorne to McLendon's land to meet
 the men from Brushy Creek. Nicholson testified he was supposed to receive $5,000 from the purchase-price money but never did. On cross-examination, Nicholson testified the State agreed to let him out of jail, where he remained on bond, and drop the charges if he testified against Terrell.
 

 ¶ 15. Hawthorne testified he had been offered $2,000-$1,000 upfront and $1,000 after the deal closed-to record the false deeds. Hawthorne said he did not draft the deeds, nor had he ever met the person who notarized them. At first, he said only Nicholson put him up to it. However, the State impeached him with a prior statement he had given, in which he implicated Terrell as the person who had organized the scheme. Hawthorne insisted he had given the statement to try and "put it off on Pat Terrell." Hawthorne also claimed that, after he received the $20,3000 check from Brushy Creek, he tried to give Terrell his cut of the money through a third person, but Terrell refused. When asked pointedly if someone had paid him not to testify against Terrell, Hawthorne admitted Terrell had paid him several hundred dollars not to testify against him.
 

 4. Civil Judgments Against Terrell
 

 ¶ 16. As its final witness, the State called Clint Langley of the Jefferson Davis County Circuit Clerk's office. Langley sponsored the admission of several civil judgments against Terrell related to forged deeds and his wrongful taking of timber.
 

 ¶ 17. The State tried to call Langley earlier in the trial. But Terrell objected, arguing Langley had not been disclosed as a potential witness.
 
 See
 
 URCCC 9.04(I).
 
 [2]
 
 According to the State, Terrell could not claim any unfair surprise. The prosecutor explained he had just learned about the judgments the morning of trial. But Terrell's trial attorney had personally represented Terrell in these civil matters and was well aware of them. The State offered the judgments under Mississippi Rule of Evidence 404(b). The trial judge agreed they qualified as Rule 404(b) evidence but noted he would have to balance the judgments' admissibility with the potential prejudice.
 
 See
 
 M.R.E. 403.
 

 ¶ 18. Terrell did not dispute the judgments' admissibility under Rule 404(b). Rather, his objection was based solely on Rule 9.04. His attorney insisted the judgments had to be disclosed during discovery to avoid trial by ambush. The trial judge reasoned, "You're not surprised ... if you were his lawyer." Still, the judge acknowledged Terrell's counsel needed time to further review the documents, citing
 
 Box v. State
 
 ,
 
 437 So.2d 19
 
 (Miss. 1983). The judge ruled the State could not call Langley at that point in the trial but possibly could call Langley later.
 

 ¶ 19. At the close of its case-in-chief, the State recalled Langley. And this time, the judge permitted Langley to testify. Terrell's lawyer requested a mistrial under Rule 9.04, claiming he had insufficient time to defend against the judgments. Alternatively, he requested-in the event his motion was denied and the judgments admitted-a limiting instruction to prevent undue prejudice under Rule 403. The court denied his request for a mistrial. The judge found there was no unfair surprise, as Terrell's counsel had represented Terrell on two of the civil matters. Also, the judge had given Terrell's lawyer time to review the civil judgments
 
 and
 
 interview Langley.
 
 See
 
 URCCC 9.04.
 

 ¶ 20. After the judge decided the evidence passed Rule 403 muster, the court admitted two judgments into evidence.
 

 One was a 2012 order granting summary judgment to several plaintiffs who had sued Terrell and his timber company for forging deeds with their signatures and causing them more than $10,000 in damages. The other was a 2009 judgment ordering Terrell to pay $40,000 for wrongfully cutting timber from one hundred acres of land in Jefferson County belonging to someone else.
 

 ¶ 21. At the end of trial, the judge gave a limiting instruction. He specifically instructed the jury it could consider the judgment as evidence of Terrell's knowledge and intent but not as "proof of guilt of the charges for which he is presently on trial."
 

 B. Defense
 

 ¶ 22. At the close of the State's case, Terrell moved for a directed verdict, which was denied. Terrell rested without calling any witnesses.
 

 III. Conviction
 

 ¶ 23. The jury found Terrell guilty on all four counts. He was sentenced to five years' imprisonment for timber theft and five years for conspiracy to commit timber theft. He was also sentenced to ten years for false pretenses and five years for conspiracy to commit false pretenses. The court ordered all sentences to run consecutively. In addition to imposing $25,000 in fines,
 
 [3]
 
 the court also ordered Terrell to pay McLendon $97,921.64 in restitution.
 

 ¶ 24. The trial judge denied his post-trial motion for judgment notwithstanding the verdict (JNOV) or, alternatively, a new trial. Terrell now appeals to this Court.
 

 Discussion
 

 I. Motion for Directed Verdict and JNOV
 

 ¶ 25. On appeal, Terrell argues the trial court wrongly denied his motions for directed verdict and JNOV. Both motions challenged the sufficiency of the State's evidence.
 

 ¶ 26. When reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State. And we ask whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."
 
 Bush v. State
 
 ,
 
 895 So.2d 836
 
 , 843 (Miss. 2005).
 

 A. Accomplice Testimony
 

 ¶ 27. Terrell casts the testimony of his coconspirators Nicholson and Hawthorne, not in a light most favorable to the State, but in an
 
 unfavorable
 
 light. He suggests their testimony was "uncorroborated, unreasonable, self-contradictory and substantially impeached." Thus, he argues, it was insufficient as a matter of law to convict him.
 

 ¶ 28. Usually, uncorroborated testimony may sustain a conviction. But we have held this general notion inapplicable when "testimony is unreasonable, self contradictory or substantially impeached."
 
 Osborne v. State
 
 ,
 
 54 So.3d 841
 
 , 846 (Miss. 2011) (citing
 
 Ballenger v. State
 
 ,
 
 667 So.2d 1242
 
 , 1253 (Miss. 1995) ). Terrell's problem is that he fails to show Nicholson's and Hawthorne's testimonies were uncorroborated-let alone so unreasonable, self-contradictory, or substantially impeached that they were insufficient as a matter of law to support his conviction.
 

 ¶ 29. Hawthorne's testimony corroborated Nicholson's and vice versa.
 
 See
 

 id.
 
 at 847 (requiring "[o]nly slight corroboration of an accomplice's testimony"). Yet
 Terrell contends one accomplice's testimony cannot corroborate another's. As support, he cites
 
 Williams v. State
 
 ,
 
 32 So.3d 486
 
 (Miss. 2010). But this is not what
 
 Williams
 
 says. Rather,
 
 Williams
 
 explained "that testifying accomplices cannot corroborate each other sufficiently
 
 to obviate the necessity of a cautionary jury instruction.
 
 "
 

 Id.
 

 at 492
 
 (emphasis added). And here, the trial court gave a cautionary instruction on accomplice testimony. So
 
 Williams
 
 does not apply. Further, both Nicholson's and Hawthorne's testimony was corroborated in part by Newsome, who testified he spoke several times with Terrell about the Hawthorne/Brushy Creek deal. He too connected Terrell to this venture.
 
 See
 

 Osborne
 
 ,
 
 54 So.3d at 847
 
 . The State also presented other circumstantial evidence-namely, McLendon's 2007 dealing with Terrell and the civil judgments-that supported both accomplices' implicating Terrell as the mastermind behind the scheme to use forged deeds to steal timber.
 
 [4]
 

 ¶ 30. As to Terrell's claims that Nicholson's and Hawthorne's testimony was contradictory and substantially impeached, this goes to the weight and credibility-not the legal sufficiency-of Nicholson's and Hawthorne's testimony. And it is the jury's job to make weight and credibility determinations.
 
 Osborne
 
 , 54 So.2d at 846. "[W]here the evidence justifies a verdict," we must accept this evidence "as having been found worthy of belief."
 
 Gillett v. State
 
 ,
 
 56 So.3d 469
 
 , 505 (Miss. 2010).
 

 B. Timber Theft
 

 ¶ 31. Next, Terrell specifically challenges the sufficiency of the evidence supporting his conviction for timber theft. Under Mississippi Code Section 97-17-59(2) (Rev. 2014):
 

 Any person who shall knowingly, willfully and feloniously take, steal and carry away from the lands of another any merchantable timber on the property of another, of the value of Two Hundred Fifty Dollars ($250.00) or more, whether such timber is growing, standing, or lying on the lands, shall be guilty of a felony[.]
 

 ¶ 32. Timber theft is a form of larceny.
 
 See e.g.
 
 ,
 
 Pollard v. State
 
 ,
 
 932 So.2d 82
 
 (Miss. Ct. App. 2006). And essential to any larceny is "asportation"-the carrying away or removal of the property with the felonious "intent to deprive the owner of his property permanently, and to convert it to the use of the taker or of some person other than the owner."
 
 Mapp v. State
 
 ,
 
 248 Miss. 898
 
 , 904,
 
 162 So.2d 642
 
 , 645 (1964). Terrell argues the State failed to prove this element because it was not Terrell or someone in on the scam who carried away McLendon's timber. Instead, the timber was harvested by one of Terrell's victims, Brushy Creek. But we fail to see how Brushy Creek's innocence in the matter absolves Terrell of criminal liability.
 
 See
 

 McAlevy v. Commonwealth
 
 ,
 
 44 Va.App. 318
 
 ,
 
 605 S.E.2d 283
 
 , 286 (2004) (refusing to allow larceny convict to "escape criminal responsibility for a crime which he arranges to have committed by an unwitting agent");
 
 Jones v. State
 
 ,
 
 256 P.3d 527
 
 , 536 (Wyo. 2011) (finding, when determining if the asportation element has been met, "no reason to draw the distinction between the agent who has no knowledge of the defendant's
 criminal activity and the agent who has agreed to the criminal enterprise").
 

 ¶ 33. While this Court has not addressed this scenario head-on-when an innocent purchaser is the one who carries away the property-other jurisdictions have. And the majority have concluded "the asportation element of larceny may be imputed to a defendant who acts through an innocent agent."
 
 McAlevy
 
 ,
 
 605 S.E.2d at
 
 286 (citing
 
 Crutcher v. State
 
 ,
 
 156 Ark. 399
 
 ,
 
 246 S.W. 496
 
 (1923) ;
 
 Scott v. State
 
 ,
 
 138 Fla. 568
 
 ,
 
 189 So. 661
 
 (1939) ;
 
 Smith v. State
 
 ,
 
 11 Ga.App. 197
 
 ,
 
 74 S.E. 1093
 
 (1912) ;
 
 Aldrich v. People
 
 ,
 
 224 Ill. 622
 
 ,
 
 79 N.E. 964
 
 (1906) ;
 
 State v. Hunt
 
 ,
 
 45 Iowa 673
 
 , 675 (1877) ;
 
 State v. Patton
 
 ,
 
 364 Mo. 1044
 
 ,
 
 271 S.W.2d 560
 
 (1954) ;
 
 Sanditen v. State
 
 ,
 
 22 Okla.Crim. 14
 
 ,
 
 208 P. 1040
 
 (1921) ;
 
 Farris v. State
 
 ,
 
 55 Tex.Crim. 481
 
 ,
 
 117 S.W. 798
 
 (1909) );
 
 see also
 

 State v. Victor
 
 ,
 
 368 So.2d 711
 
 , 713 (La. 1979) (noting its prior "holding that the 'asportation' could not be accomplished by means of the acts of a third person has uniformly received scholarly criticism as illogical and unduly technical").
 

 ¶ 34.
 
 McAlevy
 
 involved very similar facts to these. There, the defendant misrepresented he owned some farm equipment and "sold" it to an innocent purchaser. At the defendant's go-ahead, the purchaser took the equipment away from the farm. On appeal of his larceny conviction, the defendant made the same argument as Terrell does-that the innocent purchaser's removal of the equipment could not be attributed to him to satisfy the asportation element of larceny. The Court rejected that argument. Instead, it held that "[u]sing an innocent purchaser of property to take and carry away property not belonging to the seller is no different legally than if [the defendant] first removed it from the farm and then sold it to the innocent purchaser."
 
 McAlevy
 
 ,
 
 605 S.E.2d at
 
 286 ;
 
 see also
 

 Jones
 
 ,
 
 256 P.3d at 536
 
 (holding that an innocent purchaser's removal of a the victim's car was attributable to the defendant who "sold" it to him and thus satisfied the asportation element of larceny).
 

 ¶ 35. The same is true here. The evidence showed Terrell used not only Hawthorne and Nicholson but also the unwitting Brushy Creek to steal McLendon's timber. The evidence showed Brushy Creek harvested the timber only after Terrell's coconspirators Hawthorne and Nicholson showed agents from Brushy Creek McLendon's land, falsely represented Hawthorne owned the land-by recording the fake deeds-and then accepted $20,300 in exchange for the right to harvest the timber. Thus, even though Terrell did not physically carry away McLendon's timber, he "was just as much guilty of the asportation as if he had taken the [timber] with his own hands."
 
 Scott
 
 ,
 
 189 So. at 662
 
 (holding that "[i]t was not necessary for [the defendant] to take physical possession of the hogs" but instead was enough that the defendant "sold" the hogs, which were not his, to an innocent purchaser who hauled them off in his presence);
 
 see also
 

 Smith
 
 ,
 
 74 S.E. at 1093
 
 (holding that the asportation element of larceny was proved by evidence the defendant pointed out a cow as his, received payment for the cow, and directed the purchaser to drive the cow away).
 

 ¶ 36. The dissent disagrees with our application of the innocent-purchaser doctrine, not based on the law, but based on a strained literal reading of the indictment. According to the dissent, the State's theory left no room for an innocent purchaser to accomplish the asportation. Instead, it insists the State had to prove the "mere conveyance" to Brushy Creek of the timber rights via false documents "actually move[d] the timber." But contrary to the dissent's stance, Terrell's asporation
 though an innocent purchaser is
 
 exactly
 
 what the indictment meant when it alleged that Terrell and his coconspirators, "[b]y use of the artifice and false documents, ... did take, steal and carry away the merchantable timber[.]" We can all agree that the act of executing inanimate documents cannot physically move timber. And the indictment never alleged that is what happened. Instead, the indictment clearly charged that Terrell accomplished the timber larceny through an innocent purchaser, asserting Terrell, Hawthorne, and Nicholson "did by the use and employment of false documents, ... convey[ ] the timber located and growing on said real property in exchange for United States currency to a timber company, namely Brushy Creek Timber Company,
 
 causing said timber to be harvested
 
 [.]" (Emphasis added.)
 

 ¶ 37. Terrell pushes this same asportation argument in his attack on the jury instructions. As the dissent points out, the timber-theft instruction tracked the language of the indictment. So for the same reason we reject his no-evidence-of-asportation claim, we find no merit in his argument that the timber-theft instruction given did not properly instruct the jury on the asportation element.
 

 ¶ 38. We also find the judge properly refused to instruct the jury that Terrell had to personally carry away the timber to be guilty of timber theft. Again, this is not the law. Instead, we find the judge was right to instruct that Terrell was guilty of timber theft, if the jury found "[b]y use of the artifice and false documents, ... Terrell did take, steal and carry away the merchantable timber[.]"
 
 [5]
 

 ¶ 39. Because the evidence was sufficient and the jury was properly instructed, we affirm Terrell's conviction and sentence for timber theft.
 

 C. False Pretenses
 

 ¶ 40. Terrell next attacks the sufficiency of the evidence to support his false-pretenses conviction. Under Mississippi Code Section 97-19-39(2) (Rev. 2014):
 

 Every person, who with intent to cheat or defraud another, shall designedly, by color of any false token or writing, or by another false pretense, obtain the signature of any person to any written instrument, or obtain from any person any money, personal property, or valuable thing, with a value of Five Hundred Dollars ($500.00) or more, upon conviction thereof shall be guilty of a felony[.]
 

 There are three necessary elements to this count: (1) "the pretenses were false," (2) Terrell "knew them to be false," and (3) "the pretenses were the moving cause by which the money was obtained."
 
 Allred v. State
 
 ,
 
 605 So.2d 758
 
 , 761 (Miss. 1992) (citations omitted).
 

 ¶ 41. On appeal, Terrell does not suggest the State failed to prove any one of these three elements. Instead, he relies on what
 
 Allred
 
 further requires the State to prove in a false-pretenses case-that "the property or money obtained under false pretenses must have been 'to the
 detriment or injury of the person from whom he obtains the same.' "
 

 Id.
 

 (quoting
 
 Carter v. State
 
 ,
 
 386 So.2d 1102
 
 , 1105 (Miss. 1980) ). Terrell argues the State failed to show his intended false-pretenses victim, Brushy Creek,
 
 [6]
 
 suffered an injury or detriment. As support, Terrell latches on to Davis's testimony that it sold McLendon's timber for a $6,000 profit. In other words, Terrell argues Brushy Creek suffered no injury or detriment because it lost no money on the deal.
 

 ¶ 42. But the State did not have to show Brushy Creek suffered a
 
 monetary loss
 
 to prove it had been injured. Nor was it required to prove it wrote the $20,300 check to its detriment. Instead, the alleged detriment was that Brushy Creek did not lawfully obtain title to the timber, because Hawthorne forged the deeds.
 
 See
 

 Anderson v. State
 
 ,
 
 738 So.2d 253
 
 , 257 (Miss. Ct. App. 1998) (noting that a bona fide purchaser of stolen property acquires no title or interest in the property). The title still belongs to McLendon. Thus, as the indictment pled, Brushy Creek is indebted to McLendon for the fraudulently obtained timber.
 

 ¶ 43. Because the evidence showed Brushy Creek paid $20,300 for timber to which it never acquired title or interest, just as in
 
 Anderson
 
 , "[t]he jury was entitled to draw a reasonable deduction ... that [Brushy Creek] suffered an injury as a result of [Terrell's] fraudulent conduct."
 

 Id.
 

 at 257-58
 
 .
 

 ¶ 44. We therefore find no error in the judge's refusal to give Terrell's proposed jury instruction, D-4, which erroneously would have required the State to prove Brushy Creek suffered a "monetary loss" to find Terrell guilty of false pretenses. Nor can we find reversible error in the trial court's choosing to give Jury Instruction Number 9 as the instruction on false pretenses, instead of Terrell's proposed instruction, D-6. While D-6 succinctly listed the essential elements of false pretenses, Instruction Number 9 correctly states the law, was tailored to the facts of the case, and included all essential elements of false pretenses.
 

 ¶ 45. So the evidence was sufficient and the jury was properly instructed on the false-pretenses count.
 

 D. Two Conspiracies
 

 ¶ 46. While the evidence supports both the false-pretenses and timber-theft convictions, we agree with Terrell that it supports only
 
 one
 
 conspiracy conviction.
 

 ¶ 47. Terrell was convicted of both conspiracy to commit timber theft and conspiracy to commit false pretenses. He received separate, consecutive, five-year sentences on each count. But "[a] single agreement to commit several crimes constitutes one conspiracy."
 
 United States v. Broce
 
 ,
 
 488 U.S. 563
 
 , 570-71,
 
 109 S.Ct. 757
 
 , 763,
 
 102 L.Ed. 2d 927
 
 (1989) ;
 
 see also
 

 United States v. Rabhan
 
 ,
 
 628 F.3d 200
 
 , 204 (5th Cir. 2010). And, here, the evidence shows there were not two separate conspiracies but rather one conspiracy with two illegal objects-to steal McLendon's timber and to obtain $20,300 from Brushy Creek through false pretenses.
 

 ¶ 48. Thus, Terrell's two, five-year sentences for conspiracy to commit false pretenses and conspiracy to commit timber theft punish him twice for the same illegal agreement, violating the constitutional prohibition against double jeopardy.
 
 See
 
 U.S. Const. amend V (applicable to the States through the Due Process Clause of the Fourteenth Amendment).
 

 ¶ 49. To remedy this double punishment, we vacate both sentences and remand the two conspiracy convictions to the trial court with instructions to dismiss-at the State's election-one of the conspiracy counts and resentence Terrell on the remaining conspiracy count.
 
 See, e.g.
 
 ,
 
 United States v. Privette
 
 ,
 
 947 F.2d 1259
 
 , 1263 (5th Cir. 1991).
 

 II. Motion for New Trial
 

 ¶ 50. Alternatively, Terrell claims he is entitled to a new trial based on the admission of the civil judgments, the prosecution's closing argument, the weight of the evidence, and/or the trial court's failure to approve his coconspirators' immunity agreements.
 

 A. Admission of Civil Judgments
 

 1. Uniform Rule of Circuit and County Court Practice 9.04
 

 ¶ 51. As he argued to the trial court, Terrell maintains the admission of the previously undisclosed civil judgments entitled him to a mistrial under Rule 9.04.
 
 See
 
 URCCC 9.04. This rule-now supplanted by Mississippi Rule of Criminal Procedure 17.9(b) -adopted the procedures set forth in
 
 Box v. State
 
 ,
 
 437 So.2d 19
 
 , 23-24 (Miss. 1983) (Robertson, J., specially concurring). These
 
 Box
 
 procedures apply when the State attempts to enter previously undisclosed evidence over the defendant's objection.
 
 McCullough v. State
 
 ,
 
 750 So.2d 1212
 
 , 1217 (Miss. 1999). Rule 9.04 directs the trial court to "grant the defense a reasonable opportunity to interview the newly discovered witness [and] to examine the newly produced documents[.]" URCCC 9.04. Then-
 

 If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.
 

 Id.
 

 ¶ 52. In reviewing what transpired at trial, we find the trial judge properly followed the
 
 Box
 
 protocol. When the State first tried to call Langley to introduce the civil judgments, the judge did not allow this. He told the State he would consider this later in the trial. This gave Terrell's counsel additional time to review the documents. And when the State later recalled Langley, the court recessed trial to give Terrell's attorney an opportunity to interview Langley.
 
 See
 
 URCCC 9.04. After doing so, the trial judge determined a mistrial was not warranted, because the existence of the publicly recorded judgments could hardly have come as an "unfair surprise" to Terrell or his attorney, who also represented Terrell in these civil matters.
 

 ¶ 53. The decision to deny a mistrial was within the court's discretion.
 
 See
 

 Mouton v. State
 
 ,
 
 227 So.3d 1079
 
 , 1083 (Miss. 2017) (citing
 
 Hurst v. State
 
 ,
 
 195 So.3d 736
 
 , 744 (Miss. 2016) ;
 
 Payton v. State
 
 ,
 
 897 So.2d 921
 
 , 942 (Miss. 2003) ) (decisions on Rule 9.04 and motions for continuance are within the trial court's discretion). After review, we find no abuse of that discretion.
 

 2. Rules of Evidence 403 and 404(b)
 

 ¶ 54. Nor do we find error in the trial court's determining the probative value
 of the civil judgments outweighed any danger of unfair prejudice.
 
 See
 
 M.R.E. 403.
 

 ¶ 55. On appeal, Terrell argues the trial court erred by even reaching a Rule 403 balancing test and that it instead should have found this evidence was completely inadmissible under Rule 404(b).
 
 See
 
 M.R.E. 404(b). But Terrell did not advance this argument at trial and thus cannot raise it for the first time on appeal.
 
 Rubenstein v. State
 
 ,
 
 941 So.2d 735
 
 , 761 (Miss. 2006) ("An established principle of appellate review is that issues not brought before the trial court are deemed waived and may not be raised for the first time on appeal."). Instead, Terrell's alternative objection to Rule 9.04 was that the evidence should be excluded under Rule 403, because the probative value of this evidence to prove knowledge and intent was outweighed by the danger of unfair prejudice. And he asked for a limiting instruction on the use of this evidence.
 
 [7]
 

 ¶ 56. Thus, just as in
 
 Pollard
 
 , the question we face on appeal is not whether the civil judgments were relevant-and thus admissible-under Rule 404(b). Rather, the inquiry is whether the probative value of this evidence to show Terrell's knowledge and intent was outweighed by the danger of unfair prejudice.
 
 Pollard
 
 ,
 
 932 So.2d at 87-88
 
 .
 

 ¶ 57. Because the civil judgments were admitted under Rule 404(b), the trial court properly recognized this evidence would have to pass through Rule 403's filter.
 
 See
 

 id.
 

 at 88
 
 . "In making this determination, the trial court is given a degree of discretion."
 

 Id.
 

 In
 
 Pollard
 
 , the Court of Appeals affirmed a trial court's strikingly similar decision. In that timber-theft case, the trial judge had admitted under Rule 404(b) evidence that the defendant had not paid for timber he had cut from another property owner's land. This evidence was admitted to show the defendant's intent to steal the timber he was criminally charged with taking.
 

 Id.
 

 at 87
 
 . In doing so, the trial court "implicit[ly] ... found the evidence more probative than prejudicial."
 

 Id.
 

 at 88
 
 . Finding no abuse of discretion, the Court of Appeals affirmed.
 

 ¶ 58. Here, we likewise find no abuse of discretion. Evidence of a wrong act "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." M.R.E. 404(b). However, Rule 404(b) permits admission for other purposes. These purposes include "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake,
 or lack of accident." And, here, just as in
 
 Pollard
 
 , evidence Terrell had been found liable for taking other people's timber and forging deeds showed Terrell had the requisite knowledge and intent to plot a conspiracy to take McLendon's timber by forging deeds to sell the timber to Brushy Creek.
 
 Pollard
 
 ,
 
 932 So.2d at 88
 
 .
 

 ¶ 59. The State's theory was that Terrell, whose name was not on the deed and who never met agents from Brushy Creek in person, put Hawthorne and Nicholson up to the scheme. In his waffling testimony, at some point Hawthorne suggested Terrell was just the fall guy, unconnected with the conspiracy. But when pressed, Hawthorne admitted Terrell actually had paid him not to testify at Terrell's trial. "[O]ur traditional view [is] that in a conspiracy prosecution, the range of relevant evidence is quite wide."
 
 Ford v. State
 
 ,
 
 546 So.2d 686
 
 , 689 (Miss. 1989) (citing
 
 Peoples v. State
 
 ,
 
 501 So.2d 424
 
 , 429 (Miss. 1987) ;
 
 McCray v. State
 
 ,
 
 486 So.2d 1247
 
 , 1251 (Miss. 1986) ;
 
 Griffin v. State
 
 ,
 
 480 So.2d 1124
 
 , 1126 (Miss. 1985) ). Considering that Terrell tried to bribe his coconspirator not to testify, the evidence that Terrell had been found civilly liable for cutting timber not belonging to him and for forging a deed was relevant to show Terrell not only knew about and intended to join but also planned the conspiracy to have Hawthorne forge deeds to "sell" McLendon's timber to Brushy Creek for $20,300.
 
 See
 

 United States v. Gonzalez
 
 ,
 
 76 F.3d 1339
 
 , 1347-48 (5th Cir. 1996) (holding that, in a conspiracy case, evidence defendant had been charged in a similar crime "raises the issue of intent sufficiently to justify the admission of Rule 404(b) evidence");
 
 see also
 

 Shanklin v. Lowman
 
 ,
 
 2011 WL 290643
 
 , at *13 (Ohio Ct. App. Jan. 24, 2011) (holding that civil judgments against a defendant for unauthorized cutting of trees, though involving slight factual differences, were "still relevant as [they] involved Lowman removing timber from property without authorization" and thus were admissible as other-acts evidence in a landowner's action against a proprietor alleging trespass, damage to real property, and conversion of lumber).
 

 ¶ 60. As the dissent notes, the civil judgments here were entered after Terrell committed the charged crimes. But that does not itself make them less relevant. This court has held, "[e]vidence of other bad acts is ... admissible regardless of whether they occur before or after the charged offense."
 
 Leedom v. State
 
 ,
 
 796 So.2d 1010
 
 , 1015 (Miss. 2001). And this Court's view is not an outlier. It is generally accepted that " Rule 404(b) draws no distinction between bad acts committed before and bad acts committed after the charged offense."
 
 United States v. Latney
 
 ,
 
 108 F.3d 1446
 
 , 1449 (D.C. Cir. 1997). Instead, "the principles governing what is commonly referred to as other crimes evidence are the same whether the conduct occurs before or after the offense charged."
 

 Id.
 

 at 1450 (citing
 
 United States v. Delgado
 
 ,
 
 56 F.3d 1357
 
 , 1365 (11th Cir. 1995) ;
 
 United States v. Olivo
 
 ,
 
 80 F.3d 1466
 
 , 1469 (10th Cir. 1996) ;
 
 United States v. Beechum
 
 ,
 
 582 F.2d 898
 
 , 902 n.1 (5th Cir. 1978) (en banc)).
 
 See also
 

 United States v. Mohr
 
 ,
 
 318 F.3d 613
 
 , 617 (4th Cir. 2003) ( Rule 404(b)"covers evidence of both prior and subsequent acts.");
 
 United States v. McGilberry
 
 ,
 
 620 F.3d 880
 
 , 886 (8th Cir. 2010) (" Rule 404(b) draw[s] no distinction between prior and subsequent acts that would support different analyses[.]");
 
 United States v. Bibo-Rodriguez
 
 ,
 
 922 F.2d 1398
 
 , 1400 (9th Cir. 1991) (holding subsequent-act evidence was admissible to prove intent). So long as "the bad acts evidence is relevant to something provable other than the defendant's character," it is admissible under Rule 404(b).
 
 Latney
 
 ,
 
 108 F.3d at 1449
 
 .
 

 ¶ 61. A good example and discussion of this is found in
 
 Latney
 
 , where a defendant was charged with aiding and abetting in the distribution of crack cocaine. Eight months after the alleged crime, during the defendant's arrest, the police found 250 grams of crack cocaine in his home and more cocaine in his car. Over the defendant's Rule 404(b) objection, the trial court admitted this later evidence to show the defendant's intent and knowledge of the earlier-occurring crime.
 

 Id.
 

 at 1448
 
 . On appeal, the D.C. Circuit found the evidence's probative value to show knowledge and intent of the charged crime "beyond question."
 

 Id.
 

 The fact the defendant was using his car eight months later to facilitate drug trafficking "made it more likely that he was doing the same eight months earlier."
 

 Id.
 

 ¶ 62. In affirming the trial court's ruling, the D.C. Circuit rejected the argument that the dissent essentially implies here-that the timing of the bad act makes it less relevant. In doing so, the Court gave the following analogy:
 

 Suppose the defendant is charged with committing a murder in 1990. The fatal bullet contains distinctive rifling markings. In 1993 the defendant is arrested for illegal possession of a pistol. When the pistol is test fired, the bullets contain the same markings.
 
 No one would suppose that because the defendant was found in possession of the pistol three years after the murder this evidence is not relevant
 
 . Of course if the defendant had been caught with the gun three hours after the shooting, that evidence would be more powerful. But the strength of the evidence is a different matter than its relevancy. So long as the evidence makes a fact of consequence more or less likely, it is relevant.
 

 Id.
 

 at 1450
 
 (emphasis added).
 

 ¶ 63. Here, the timing of the entry of the civil judgments went to the weight, not the relevance-and thus the admissibility-of this evidence. The civil judgments clearly were relevant to show Terrell's knowledge and his intent to use forged deeds to steal McLendon's timber by illegally "selling" it to Brushy Creek. Thus, under Rule 404(b), this evidence was admissible. And given the relevance of this evidence under Rule 404(b), we cannot say the trial court abused its discretion under Rule 403 when it found the probative value of this evidence outweighed the danger of any unfair prejudice.
 
 See
 

 Pollard
 
 ,
 
 932 So.2d at 87-88
 
 .
 

 ¶ 64. At the close of trial, as requested by Terrell, the trial court gave a limiting instruction, specifically admonishing the jury it "must not consider this testimony as proof of guilt of the charges for which he is presently on trial." And our law requires we presume the jury followed this instruction.
 
 See
 

 Batiste v. State
 
 ,
 
 121 So.3d 808
 
 , 834 (Miss. 2013). Therefore, we find the admission of these judgments into evidence was not error.
 

 B. Closing Argument
 

 ¶ 65. Terrell further claims he is entitled to a new trial based on the State's closing argument. According to Terrell, the way the State discussed the two civil judgments invited the jury to consider this evidence as proof of his bad character, not just his intent and knowledge, in violation of Rule 404(b). Terrell also asserts the State made an impermissible "send a message" argument. But as Terrell concedes, he made no contemporaneous objection to the alleged improper statements. And as we have said, "[t]he failure to object acts as a waiver."
 
 Jackson v. State
 
 ,
 
 174 So.3d 232
 
 , 236 (Miss. 2015) (quoting
 
 Havard v. State
 
 ,
 
 928 So.2d 771
 
 , 791 (Miss. 2006) ).
 

 ¶ 66. Acknowledging this, Terrell asserts the State's use of the civil judgments
 amounts to plain error. But for there to be plain error, there must a clear, plain, and obvious deviation from a legal rule that prejudiced the outcome of trial.
 
 Grayer v. State
 
 ,
 
 120 So.3d 964
 
 , 969 (Miss. 2013). And here there was no error. In closing, the State highlighted that the civil judgments showed Terrell's knowledge, intent, and opportunity to steal McLendon's timber through the use of forged deeds.
 
 [8]
 
 Given the "wide latitude" attorneys are afforded during closing,
 
 [9]
 
 we cannot say these comments amounted to obvious error. Moreover, even if this issue was not procedurally barred, Terrell cannot show prejudice. The trial court clearly instructed the jury on the limited admissibility of the Rule 404(b) evidence. And, again, we must presume jurors followed the court's instructions.
 
 Batiste
 
 ,
 
 121 So.3d at 834
 
 .
 

 ¶ 67. Terrell also contends the State made a "send a message" argument that was so inflammatory and prejudicial that the trial court should have objected
 
 sua sponte
 
 .
 
 See
 

 O'Connor v. State
 
 ,
 
 120 So.3d 390
 
 , 399 (Miss. 2013) (holding that "even in the absence of a contemporaneous objection, we will review on appeal a claim that a prosecutor made an improper send-a-message argument if the argument is so inflammatory that the trial judge should have objected on his own motion." (internal quotations omitted)). Again, Terrell did not object at trial. And after review, we do not find the State's comments so inflamed the jury that the trial court erred by not intervening on its own. A "send the message" argument is one that encourages "juries to use their verdict to 'send-a-message' to the public or to other potential criminals," instead of "render[ing] a verdict based solely on the evidence introduced at the trial of that case."
 
 Brown v. State
 
 ,
 
 986 So.2d 270
 
 , 275 (Miss. 2008). Here, the jury was invited-not to send a message to other potential criminals-but to understand why a deal was struck with coconspirators, for the purpose of protecting people like McLendon and his wife from Terrell.
 
 [10]
 
 Furthermore, this issue is procedurally barred, and the argument did not amount to not reversible error.
 
 [11]
 

 C. Weight of the Evidence
 

 ¶ 68. Terrell next complains the jury's verdict was so contrary to the overwhelming weight of the evidence as to
 warrant a new trial. We review the denial of a motion for new trial for abuse of discretion. "In carrying out this task, we weigh the evidence in the light most favorable to the verdict, 'only disturb[ing] a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.' "
 
 Little v. State
 
 , 2014-CT-01505-SCT,
 
 2017 WL 4546740
 
 , at *4 (quoting
 
 Lindsey v. State
 
 ,
 
 212 So.3d 44
 
 , 45 (Miss. 2017) ).
 

 ¶ 69. Our review shows no such injustice. The evidence Terrell claims preponderates so heavily against his verdict is Nicholson's and Hawthorne's inconsistent testimony and that Hawthorne testified he tried to give Terrell his cut of the $20,300, but Terrell refused it. As mentioned, what weight and credibility to assign Nicholson's and Hawthorne's testimony was a question solely for the jury.
 
 Osborne
 
 ,
 
 54 So.3d at 846
 
 . We must view testimony in the light most favorable to the verdict. And in this light, their testimony supports the jury's decision. The same is true with Hawthorne's testimony that Terrell refused his cut of the money. The crime of conspiracy is complete when the agreement is formed.
 
 State v. Thomas
 
 ,
 
 645 So.2d 931
 
 , 933 (Miss.1994). When viewed in the light most favorable to the verdict, the evidence Terrell tried to distance himself from the conspiracy after the fact is immaterial.
 

 ¶ 70. Thus, the trial court did not err when it denied Terrell's motion for a new trial.
 

 D. Coconspirator Immunity Agreements
 

 ¶ 71. Terrell finally argues that the judge reversibly erred when it denied Terrell's request "to approve the immunity agreements between the district attorney's office and [Hawthorne] and Nicholson, respectively, and explain to each of them that they were being granted transactional immunity in exchange for their testimony[.]" But Terrell cites no relevant authority.
 
 [12]
 
 The district attorney did not have to enter into an immunity agreement before Nicholson and Hawthorne testified, as Terrell asserts, to protect
 
 Terrell
 
 from the possibility his two coconspirators would offer perjured testimony in exchange for immunity. Instead, the issue of possible perjury stemming from an immunity offer is one for cross-examination.
 
 See
 

 Foster v. State
 
 ,
 
 508 So.2d 1111
 
 , 1114-15 (Miss. 1987),
 
 overruled on other grounds
 
 . And the trial judge did not hinder Terrell's right to vigorously cross-examine his coconspirators.
 

 ¶ 72. Therefore, we find Terrell was not entitled to a new trial.
 

 Conclusion
 

 ¶ 73. Because Terrell is not entitled to a new trial and the evidence was sufficient to support both his timber-theft conviction (Count I) and his false-pretenses conviction (Count III), we affirm those two convictions and sentences. But because the evidence was insufficient to support two conspiracy convictions, we vacate the sentences for both conspiracy convictions (Count II and Count IV) and remand the two conspiracy convictions to the trial court with instructions to dismiss-at the State's election-one of the conspiracy counts and resentence Terrell on the remaining conspiracy count.
 

 ¶ 74.
 
 AFFIRMED IN PART; VACATED AND REMANDED IN PART.
 

 RANDOLPH, P.J., COLEMAN, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., AND KITCHENS, P.J.
 

 While his father A.C. had died, John testified that A.C.'s heirs were John and John's four siblings-Helen McGee, Alton McLendon, Hugh L. McLendon, and Julius McLendon.
 

 Terrell's trial predated this Court's July 1, 2017 adoption of the Mississippi Rules of Criminal Procedure. So the Uniform Rules of Circuit and County Court Practice controlled.
 

 Terrell was fined $5,000 for timber theft, $5,000 for conspiracy to commit timber theft, $10,000 for false pretenses, and $5,000 for conspiracy to commit false pretenses.
 

 This Court has held that a jury may infer a conspiracy from the circumstances, "acts[,] and conduct of the alleged conspirators."
 
 Morgan v. State
 
 ,
 
 741 So.2d 246
 
 , 255 (Miss. 1999) ). "[O]nce the existence of a conspiracy is shown, only slight evidence is required to connect a particular defendant with the conspiracy."
 
 Id.
 
 (citing
 
 United States v. James
 
 ,
 
 528 F.2d 999
 
 , 1012 (5th Cir. 1976) ).
 

 More specifically, Terrell argues the judge wrongly refused his proposed instruction D-8-an instruction that required the State to prove the asportation element was accomplished personally by Terrell. He also insists the judge erred by opting instead to give Instruction Number 7, instructing that, to find Terrell guilty, the State must prove he "did by the use and employment of false documents" convey McLendon's timber to Brushy Creek, "causing said timber to be harvested." First, D-8 is an incorrect statement of the law. Again, Terrell did not have to physically carry away the timber to be guilty of timber theft. And second, under the innocent-purchaser doctrine, Terrell was guilty of timber theft, if the jury found, as Instruction Number 7 correctly stated, "[b]y use of the artifice and false documents, ... Terrell did take, steal and carry away the merchantable timber[.]"
 

 As this Court has explained, the difference between larceny and false pretenses is the victim's intent. In larceny, the victim has no intent to transfer possession of his property to the defendant. But in false pretenses, the victim actually intends to transfer title and possession of his property based on the false representations of the defendant.
 
 Courtney v. State
 
 ,
 
 174 Miss. 147
 
 ,
 
 164 So. 227
 
 (1935). Thus, when Terrell committed timber larceny, McLendon was the victim and Brushy Creek was the unwitting agent carrying out the asportation. But in paying $20,300 for the right to harvest McLendon's timber, Brushy Creek became a victim too-the victim of false pretenses.
 

 When counsel's objection, made on page 323 of the transcript, is taken in its entire context, it becomes even more clear that Terrell's counsel was asking the trial court to exclude the evidence based on Rule 403 :
 

 Your Honor, one thing I would like to add just for the record. We think that this proposed evidence is more prejudicial than probative, and we would ask the Court to make that determination on the record, and we would also-my understanding of the rule with respect to prior bad acts would be that this evidence will not be probative of the defendant's guilt on these two charges simply to show his bad character. And we would ask-I have not had an opportunity to prepare the Jury instruction, and we would ask the court if the Court sees fit, to allow this testimony to come in, that the Court will instruct the jury, when the time comes, properly about the weight and the consideration that they can give to this evidence and that is not evidence for it, to be used by them as evidence of the defendant's guilt in this case.
 

 But even if we agreed with the dissent that Terrell specifically made-and thus preserved on appeal-an objection based on Rule 404(b), such an objection would not have made a difference. The trial court clearly had the discretion to admit the judgments based on Rule 404(b)'s permitted uses.
 

 After referencing the civil judgment, the State asked:
 

 Do you know what this proves? This proves that he knew how to steal timber. That he likes to steal timber. That he knows how to make easy money by stealing timber.... The notary public, if they had been honest and efficient the way that they were supposed to be, this would have never happened. Robert Terrell knew that. He knows what he has to have have, a corrupt notary public to do these deeds, and that's what he did. In this case, that's what he did. I don't know exact-all the details of this. I just got the judgment. This man loves to steal timber. That's what he does.
 

 Ross v. State
 
 ,
 
 954 So.2d 968
 
 , 1001 (Miss. 2007).
 

 The State argued:
 

 I don't think we should leave people like John McLendon and his wife out and abandon them. I think we need to protect those kind of people. I think if it's-if it's a young person that gets his timber cut, I think we have a duty to do whatever we can to get the crooks off the street. We had to make a deal with Ricardo Hawthorne and LeArchie to get the guy of the scheme, of the scam, the flimflam who typed the deeds, who told Ricardo what he had to do, who he had to talk with. If we have to make a deal with them, we will.
 

 Bar aside, for a send-the-message argument to be reversible error, a defendant has to show prejudice.
 
 See
 

 Brown
 
 ,
 
 986 So.2d at 276
 
 . And here, the evidence was such that the jury still could have found Terrell guilty without the State's comments.
 

 Id.
 

 Terrell does cite
 
 Wright v. McAdory
 
 ,
 
 536 So.2d 897
 
 (Miss. 1988). But this case is not on point.
 
 Wright
 
 addresses a
 
 witness's
 
 right to remain silent and whether he or she can be compelled to testify when offered an immunity agreement. It does not address a defendant's rights. Moreover, Nicholson and Hawthorne testified voluntarily.