# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01143-COA

**JAMYRIAN WAYNE QUINN**  APPELLANT

**v.**

**STATE OF MISSISSIPPI**  APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 08/14/2023 |
| TRIAL JUDGE: | HON. ROBERT KEITH MILLER |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | WARREN LOUIS MARTIN JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | ANGEL MYERS McILRATH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/10/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McCARTY AND WEDDLE, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1. Jamyrian Quinn appeals his conviction in the Jackson County Circuit Court for second-degree murder. On appeal, Quinn argues that the trial court improperly excluded a defense witness and evidence about the victim's purportedly violent character.

¶2. After our review, we find no error. We therefore affirm Quinn's conviction and sentence.

## FACTS

¶3. Quinn and Courtney Todd were involved in an altercation in the parking lot of the Pure Gas Station in Gautier, Mississippi. During the altercation, Todd suffered a fatal gunshot wound. Quinn was ultimately indicted for the first-degree murder of Todd.

¶4. Testimony presented at Quinn's trial reflects that on the evening of July 15, 2019, Quinn rode to the Pure Gas Station with several friends, including Nicholas Curtis. Curtis testified that the friends went to the gas station to "hang out." Todd and his friend Frank Wells were also at the gas station. Wells testified that he and Todd drove to the gas station to purchase marijuana.

¶5. On the day of the shooting, the Pure Gas Station had fourteen surveillance cameras in use. Officers from the Gautier Police Department collected the surveillance footage from the cameras as part of the investigation into Todd's death. The surveillance footage of the shooting and the events leading up to the shooting was played for the jury.

¶6. The footage shows Todd and Curtis standing outside the gas station, interacting and talking. Quinn was standing close to the two men, observing their interaction. At one point, Todd briefly placed his hands on the pockets of Curtis's shorts, and then Todd pulled away. Todd and Curtis did not appear angry or hostile at any point. The two men began casually walking off together, with Todd behind Curtis. As they walked, Quinn quickly approached Todd and punched him. Todd appeared stunned, and he jumped away from Quinn. Quinn then displayed a gun, and Todd immediately retreated away from Quinn. Quinn followed Todd as he retreated, pointing the gun at the back of Todd's head. The footage shows Quinn speaking to Todd, and Todd facing Quinn and raising his arms up in a submissive position. During this exchange, Quinn fired two shots. Todd continued to retreat away from Quinn. As Todd retreated, Quinn followed him and continued to point the gun at him. Todd eventually crouched down on his knees and raised his hands in the air. Once Todd was on

his knees, Quinn stood over Todd and punched him, and then Quinn shot Todd in the neck. Quinn then fled from the scene. Todd ultimately died as a result of the gunshot to his neck.

¶7. The jury heard testimony from eyewitnesses describing the altercation as shown on the surveillance footage, as well as testimony about the events leading up to the altercation.

¶8. Wells testified that when he and Todd arrived at the gas station, Todd spotted Curtis and called him over to ask about buying marijuana. At the time, Todd was sitting in the driver's seat of his truck, and Wells was in the passenger seat. Curtis agreed to sell Todd some marijuana. Todd gave Curtis money, and then Curtis walked off to obtain the marijuana. Curtis returned with the marijuana and gave it to Todd. Wells testified that after examining the marijuana, Todd decided that he did not want it. Todd then called over to Curtis and asked Curtis to return his money. Curtis stated that he could not return the money, so Todd got out of his truck and walked over to talk to Curtis.

¶9. From the passenger seat of Todd's truck, Wells watched as Curtis and Todd talked. Wells observed Quinn start "swinging" at Todd and then pull out a gun. Wells heard Quinn tell Todd, "I'll kill you," and Quinn started shooting. Quinn ordered Todd to get on the ground, and then Quinn shot Todd.

¶10. The surveillance footage shows that as Todd retreated away from Quinn, he walked toward his truck, where Wells was sitting in the passenger seat. Wells testified that during the altercation, the windows of the truck were rolled down, and the driver's side door was open, giving him a clear view of the altercation. The footage shows that Quinn was standing next to Todd's truck when he fired the shot that ultimately killed Todd.

3

¶11. Curtis testified that on the day of the shooting, he was hanging out at the gas station with Quinn. Curtis testified that Todd arrived at the gas station and asked Curtis if he could buy some marijuana. Curtis explained that he and Todd knew each other. Curtis obtained some marijuana and sold it to Todd.

¶12. The State showed Curtis footage of his interaction with Todd just prior to the shooting, after Todd had exited his truck and walked over to talk to Curtis. Curtis testified that he could not recall their conversation, but Curtis clarified that Todd was not trying to fight with him and that Todd did not exhibit any hostility. When asked about the footage showing Todd grabbing at Curtis's pocket, Curtis explained that Todd was not intending to harm him. Curtis testified that he and Todd had "messed around" like that on prior occasions. The surveillance video showed that when Curtis and Todd were talking, Todd had his shirt pulled up. No firearm can be seen in the waistband of Todd's pants. When asked if Curtis saw a firearm in the pocket or waistband of Todd's pants, Curtis responded, "No."

¶13. Curtis testified that he saw Quinn punch Todd and then pull out a gun and point it at Todd. Curtis testified that he could not recall what was said between Quinn and Todd during their altercation.

¶14. Investigator Jothan Hunter with the Gautier Police Department was one of the officers dispatched to the gas station in response to the shooting. Investigator Hunter testified that officers never recovered a firearm from Todd's truck. Investigator Hunter also testified that there was no physical evidence that Todd had a firearm at the gas station.

¶15. After the State rested its case-in-chief, Quinn moved for a directed verdict, which the

4

trial court denied.

¶16.     Quinn testified in his own defense.  Quinn explained that when he saw Curtis and Todd interacting at the gas station, he thought that Todd was robbing Curtis.  Quinn testified that he could tell that Curtis was scared, so Quinn punched Todd to protect Curtis.  Quinn testified that Todd then threatened Quinn, saying, "I got something for you.  I'm fixing to go to my truck.  I'm going to kill you."  Quinn testified that he thought Todd was trying to walk to his truck to retrieve his own gun.  Quinn testified that Todd had threatened him with a gun earlier that day, and Quinn recounted that earlier altercation for the jury.  Quinn testified that he only fired his gun as a warning to Todd and that he never intended to kill Todd.

¶17.     After receiving instructions, the jury returned a verdict finding Quinn guilty of second-degree murder.  After the jury could not agree on a sentence of life imprisonment, the trial court sentenced Quinn to serve forty years in the custody of the Mississippi Department of Corrections without eligibility for parole.  After the denial of his post-trial motion, Quinn appealed.

## DISCUSSION

### I.     Exclusion of Witness Testimony as Sanction

¶18.     Quinn first argues that the trial court erroneously excluded one of his defense witnesses based on an alleged discovery violation.  We review a trial court's sanction for discovery abuses for an abuse of discretion.  *Blakely v. State*, 311 So. 3d 593, 604 (¶39) (Miss. Ct. App. 2020).  After "weighing all relevant factors in the case," this Court will affirm the imposed sanction "unless there is clear error in judgment as to the sanctions

5

imposed for violation of the discovery rule[.]" *Id.*

¶19.    The transcript reflects that on the second day of trial, after the State rested its case-in-chief, the prosecutor observed a witness list prepared by the defense. The witness list named Quinn's uncle and described him as a "new witness."[1] The State presented the issue to the trial court and objected to the uncle's testimony on the ground that defense counsel failed to disclose Quinn's uncle as a potential witness or disclose the substance of his testimony pursuant to Mississippi Rule of Criminal Procedure 17.3.[2] Rule 17.3 sets forth a defendant's discovery obligations, in pertinent part, as follows:

> If the defendant requests discovery under Rule 17, the defendant shall, subject to constitutional limitations, promptly disclose to the prosecutor . . . the following information and material . . . which is in the possession, custody, or control of the defendant or the defendant's attorney, or the existence of which is known, or by the exercise of due diligence may become known, to the defendant or defendant's counsel:
>
> (1)    Names and addresses of all witnesses in chief which the defendant may offer at trial, together with a copy of the contents of any statement (written, recorded or otherwise preserved) of each such witness and the substance of any oral statement made by any such witness[.]

MRCrP 17.3(1). The State informed the trial court that prior to seeing the list, it had no knowledge that the defense planned to call Quinn's uncle as a witness at trial.

¶20.    In response to the State's objection, defense counsel asserted that approximately a week before trial, he learned that Quinn's uncle "may be in a position to talk" about the shooting. Defense counsel stated that at a pre-trial meeting, he had informed the State about

---

[1] The witness's actual name is not in the record.

[2] Different counsel represents Quinn on appeal.

6

the recent development with Quinn's uncle and that the defense "may want to use" Quinn's uncle as a witness at trial. Defense counsel maintained that since that time, he had made Quinn's uncle available to the State to interview. Defense counsel also stated that he had properly disclosed all other defense witnesses and even set up a meeting for the prosecutors with the witnesses, and defense counsel said he was willing to do the same with Quinn's uncle.

¶21. As to the content of Quinn's uncle's testimony, defense counsel proffered that the uncle had been at the scene of the shooting and would testify that he never heard Quinn threaten to kill Todd. Defense counsel explained that this testimony "would be important for the jury to know," especially in light of Wells's testimony that he heard Quinn tell Todd, "I'll kill you." Defense counsel asserted that no witness, other than Wells, heard Quinn threaten to kill Todd.

¶22. The State argued that defense counsel's failure to disclose Quinn's uncle was a tactical advantage, alleging that Quinn's attorney "[was] going to try to pop that witness on in the front of the jury, draw an objection from the State of Mississippi, and then the inference becomes that . . . the State of Mississippi, the bad guy, is trying to keep this special secret witness that has the key to all of this from the jury." For this reason, the State requested that the trial court exclude Quinn's uncle's testimony.

¶23. Upon questioning by the trial court, defense counsel admitted that he had known since 2019—approximately four years before trial—that Quinn's uncle was an eyewitness to the shooting. However, defense counsel explained that he initially believed that Quinn's uncle

7

would testify as to the same information as every other defense witness. Defense counsel also acknowledged that he had known since 2019 that Wells had provided a statement to police officers that he heard Quinn tell Todd, "I'll kill you." Defense counsel claimed that at that time, he believed that Wells was not actually in a position to hear or see anything leading up to the shooting. Defense counsel explained that based on this belief, and based on the fact that no other witness stated that they heard Quinn tell Todd, "I'll kill you," he did not anticipate Wells to testify about Quinn's alleged statement at trial. Defense counsel further admitted that he never provided the State with a written document containing Quinn's uncle's name, contact information, and proposed testimony.

¶24. After hearing arguments from counsel, the trial court ruled that Quinn's uncle was excluded from testifying. The trial court found that defense counsel's failure to disclose the witness was done for tactical advantage, stating:

> You guys have been representing this defendant for several years. You've had the discovery for several years. You knew the importance of the statements that were on the discovery of I'll kill you, I'll kill you, I'll kill you, and you had a witness in your . . . realm of representation . . . who was allegedly at the scene, but didn't hear any of that. And I find that it's something that's not going to be admissible, so I'm not going to allow it.

¶25. On appeal, Quinn argues that the trial court abused its discretion by not following Mississippi Rule of Criminal Procedure 17.9, which sets out part of the procedure trial courts should follow when confronted with an alleged discovery violation. Quinn further argues that the record does not support the trial court's finding that the defense would have gained any tactical advantage by failing to disclose Quinn's uncle as a witness. Quinn submits that the content of the uncle's testimony was not a surprise to the State, explaining that out of all

8

the eyewitnesses who testified, only one witness (Wells) said he heard Quinn threaten to kill Todd.

¶26.   Mississippi Rule of Criminal Procedure 17.9(b) governs a trial court's procedural remedies when the defense attempts to introduce evidence during the course of trial that has not been timely disclosed to the prosecution and the prosecution "objects to the introduction for that reason[.]"  In such situations, the trial court shall:

> (1)   Grant the [prosecution] a reasonable opportunity to interview the newly discovered witness and/or examine the newly produced documents, photographs or other evidence.

> (2)   If, after such opportunity, the [prosecution] claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, In the interest of justice and absent unusual circumstances, exclude the evidence, grant a continuance for a period of time reasonably necessary for the [prosecution] to meet the non-disclosed evidence, or grant a mistrial.

MRCrP 17.9(b)(1)-(2).[3]

¶27.   When a trial court finds that an attorney willfully violated a discovery rule, the court may issue appropriate sanctions to the attorney.  MRCrP 17.9(c).  "The weight of the sanction should be based on the motivation of the offending party in violating the discovery rule." *Myers v. State*, 145 So. 3d 1143, 1150 (¶15) (Miss. 2014).  The supreme court has cautioned that when imposing a sanction for a discovery violation, "[t]he court cannot disregard the fundamental character of the defendant's right to offer the testimony of

---

[3] Rule 17.9 "adopted the procedures set forth in *Box v. State*, 437 So. 2d 19, 23-24 (Miss. 1983) (Robertson, J., specially concurring)." *Terrell v. State*, 237 So. 3d 717, 730 (¶51) (Miss. 2018).  *Box* set forth "procedures [to] apply when the State attempts to enter previously undisclosed evidence over the defendant's objection." *Id.*

witnesses in his favor." *Id*. (internal quotation marks omitted). "The general rule is that evidence must not be excluded." *Id*. However, when "the [trial] court determines that a discovery violation is willful and motivated by a desire to obtain a tactical advantage, exclusion of the evidence may be entirely proper." *Id.*

¶28. Here, the State argued that defense counsel willfully violated Rule 17.3 for the purpose of gaining a tactical advantage. The State did not request a continuance; rather, the State moved for the trial court to exclude Quinn's uncle's testimony. "We recognize that under [Rule]17.9, the State would ordinarily be required to request a continuance before complaining of the admission of previously undisclosed evidence." *Blakely*, 311 So. 3d at 605 (¶44) (quoting *De La Beckwith v. State*, 707 So. 2d 547, 574 (¶101) (Miss. 1997)).[4] However, "a request for a continuance is not a prerequisite to the exclusion of such evidence[,]" and "the State's failure to request a continuance does not abrogate the trial court's discretion to exclude such evidence in certain circumstances." *Id*.; *Pelletier v. State*, 207 So. 3d 1263, 1270 (¶32) (Miss. Ct. App. 2016). As stated, when "a discovery violation is willful and motivated by a desire to obtain a tactical advantage, exclusion of the evidence may be entirely proper." *Myers*, 145 So. 3d at 1150 (¶15); *see also De La Beckwith*, 707 So. 2d at 575 (¶103) (stating that when a discovery violation "was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it is entirely appropriate to

---

[4] In *De La Beckwith*, 707 So. 2d at 573-74 (¶¶99-101), the Mississippi Supreme Court discussed Uniform Criminal Rule of Circuit Court Practice 4.06, which was the predecessor to Uniform Circuit and County Court Rule 9.04, which is the predecessor to the current Mississippi Rule of Criminal Procedure 17.

10

exclude the witness's testimony"). The supreme court has clarified that "the record must contain evidence that the defendant committed a discovery violation to obtain a tactical advantage before exclusion becomes the appropriate sanction." *Overton v. State*, 195 So. 3d 715, 718 (¶10) (Miss. 2016).

¶29. After our review, we find that the record before us contains sufficient evidence supporting the trial court's finding that defense counsel's failure to disclose Quinn's uncle was motivated by a desire to obtain a tactical advantage at trial. Prior to excluding the testimony from Quinn's uncle, the trial court heard arguments from counsel and specifically questioned defense counsel about how long he had known that Quinn's uncle was an eyewitness and how long he had known that Wells told police officers that he had heard Quinn threaten to kill Todd. Defense counsel admitted that he had known about Quinn's uncle and Wells's statement to police for approximately four years before the trial. Defense counsel also admitted that although he had properly disclosed all other witnesses, he failed to provide the State with a written document containing Quinn's uncle's name, contact information, and proposed testimony. We further acknowledge Quinn's admission in his appellate brief that "the uncle's expected testimony was not necessarily outcome determinative." Based on the facts before us, we find that the trial court did not abuse its discretion in excluding Quinn's uncle's testimony.

## II.   Exclusion of Evidence of the Victim's Violent Character

¶30. Quinn next argues that the trial court abused its discretion by excluding evidence about Todd's violent character. Quinn asserts that by limiting evidence of Todd's violent

11

character, the trial court unfairly prevented the jury from assessing the reasonableness of Quinn's actions and restricted Quinn's ability to support his manslaughter defense.[5]

¶31. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Amos v. State*, 360 So. 3d 323, 330 (¶25) (Miss. Ct. App. 2023). Because "[a] trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence," this Court will not reverse the trial court's ruling "unless the judge abuses this discretion so as to be prejudicial to the accused." *Shaw v. State*, 915 So. 2d 442, 445 (¶8) (Miss. 2005).

¶32. The transcript reflects that the defense presented evidence of Todd's violent character through Quinn's testimony as well as the testimony of Elijah Kincaid, Quinn's friend and neighbor. Quinn told the jury about an incident between Quinn and Todd that occurred hours before the shooting. According to Quinn, on the day of the shooting, he and his son were walking to the gas station when Todd drove past them in his vehicle. Quinn testified that when Todd saw Quinn, he started yelling at Quinn. Todd then stopped his vehicle and got out. Quinn observed that Todd had a gun in his hand. Todd walked over to Quinn and yelled that he would kill him. Quinn testified that Todd told him that the only reason he would leave Quinn alone at that time was because Quinn's son was present. Quinn testified that he felt threatened by Todd, and he explained that he and Todd had a "history" because Todd's friend did not like Quinn.

¶33. Quinn admitted that he did not call the police after this encounter. Quinn explained

_____

[5] The record reflects that in addition to jury instructions on first- and second-degree murder, the jury also received instructions for culpable-negligence manslaughter and self-defense.

12

that Todd had threatened him in the past. He had reported these threats to the police "several times," but "the police wouldn't do anything about it." Quinn clarified that he had actually informed his mother, Felipa Rodriguez, about Todd's prior threat, and that Rodriguez reported it to the police. Quinn testified that he was "right there" with his mother when she called the police.

¶34. Quinn also testified about his state of mind in the moments leading up to the shooting. Quinn testified that when he saw Todd at the gas station, he did not approach Todd but, instead, watched Todd "to see how he was acting, because I know his character." Quinn explained that on multiple occasions, Todd had bullied and threatened Quinn and Quinn's friends. Quinn also stated that he witnessed the interaction between Todd and Curtis, and Quinn observed that the two men were arguing. Quinn stated that he saw Todd "pull[] his pants up in a fighting motion" and then reach into Curtis's pockets. Quinn testified that "it looked like [Todd] was robbing [Curtis]." Quinn explained that he believed Curtis was scared. Quinn testified that as Curtis walked away from Todd, Quinn observed Todd "about to get ready to hit [Curtis]," so Quinn hit Todd first. Quinn explained that he intervened to protect Curtis. Quinn testified that after he hit Todd, Todd responded, "I got something for you. I'm fixing to go to my truck. I'm going to kill you." Quinn explained that based on his interaction with Todd earlier in the day, he believed that Todd was going to retrieve a gun from his truck. Quinn testified that he "felt threatened" for himself, Curtis, and everyone else at the scene, so he then pulled out his gun to scare Todd. Quinn explained that he wanted to "stop [Todd] so we could leave." However, Quinn claimed that Todd continued to threaten

13

him by saying he was going to kill Quinn and "don't let me get to my truck." Quinn reiterated that he believed that Todd was going to his truck for the purpose of retrieving his gun so he could kill Quinn. Quinn testified that he feared for his life and the lives of everyone at the scene. Quinn stated that he fired two warning shots and instructed Todd to get on the ground. Quinn explained that when Todd did not get on the ground, Quinn hit him on the side of the head with the pistol, and the gun accidentally discharged. Quinn testified that he did not intend for the gun to fire, and he maintained that he never threatened or intended to kill Todd.

¶35. Kincaid testified that he had witnessed the earlier confrontation between Quinn and Todd on the day of the shooting. According to Kincaid, Quinn and his son were walking down the street and Todd drove past them in his vehicle. Kincaid saw Todd stop, get out of his vehicle, and yell at Quinn. Kincaid observed that Todd had "something in his hand." Kincaid testified that while Todd was yelling at Quinn, Todd "upped his hands," and Quinn then "jumped back." Kincaid testified that based on Todd's actions, it looked like "something was going to happen" between Todd and Quinn.

¶36. On appeal, Quinn argues that he should have been permitted to present additional evidence of Todd's violent character. Although evidence of a victim's character is generally irrelevant, such evidence may be introduced in limited circumstances. See MRE 404(a)-(b).[6]

_____

[6] Rule 404(a)(1) states that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." However, in criminal cases, several exceptions apply to this rule, including "evidence of an alleged victim's pertinent trait" offered by the defendant. MRE 404(a)(2)(b).

14

For example, in self-defense cases, "the reputation of the victim may be relevant when there is a claim that the victim was the initial aggressor." *Sheffield v. State*, 844 So. 2d 519, 522 (¶6) (Miss. Ct. App. 2003); *see also* MRE 404 adv. comm. note. Similarly, in cases where "the defendant claims to have acted preemptively to protect himself from a feared but yet-unrealized attack," we have held that "the defendant's knowledge concerning the victim's character for aggressive behavior may be relevant to permit the jury to assess the reasonableness of the defendant's response to what might otherwise appear as an overreaction against the victim." *Id*. Additionally, "[e]vidence of prior violent acts of the victim [and threats made by the victim], when known to the defendant, are also relevant and admissible under Rule 404(b) to show the defendant's state of mind at the time of the incident and the reasonableness of his use of force." *Jordan v. State*, 211 So. 3d 713, 717 (¶17) (Miss. Ct. App. 2016); *accord* MRE 404(b) ("Evidence of a crime, wrong, or other act . . . may be admissible for another purpose[.]").

¶37. Quinn's argument on appeal focuses on the trial court's exclusion of Quinn's mother, Rodriguez, and Leroy Carson as witnesses.[7] Quinn argues that this additional evidence of Todd's violent character was relevant to show (1) that Quinn was justifiably afraid of Todd during the incident at the gas station and (2) that his fear of Todd influenced Quinn's decision-making process and actions during the confrontation with Todd.

     A.    *Felipa Rodriguez*

---

[7] The record reflects that the State filed a motion in limine to exclude character evidence pertaining to Todd, including testimony from Rodriguez and Carson. The trial court reserved ruling on the State's motion until after the State rested its case-in-chief.

¶38. During trial, and out of the presence of the jury, the defense proffered that Rodriguez would testify that Quinn had told her about Todd's prior threatening behavior toward him and that she had reported it to multiple police officers, but the police never took any action to resolve the situation. The State objected to this proffered testimony, arguing that it improperly bolstered Quinn's testimony. The State explained that Quinn had not testified as to any specific details of Todd's prior threats, and therefore it would be improper to allow Rodriguez to testify about any specific statements Quinn had made to her. The trial court agreed and excluded Rodriguez's testimony.

¶39. The supreme court has held that "[i]n criminal and civil cases, parties may not show statements made out of court for the purpose of bolstering the testimony of a witness in court." *Jackson v. State*, 423 So. 2d 129, 130 (Miss. 1982). Specifically, the supreme court has held that "a witness cannot be bolstered and corroborated by proving that on other occasions he has made statements out of court conforming to his testimony given in court[,] and . . . the admission of such testimony in a close case is always reversible error." *Harrison v. Gatewood*, 211 Miss. 121, 127, 51 So. 2d 59, 61 (1951); *see also Young v. State*, 451 So. 2d 208, 211 (Miss. 1984) ("It was error to permit the State to bolster the testimony of its witness by showing that he had stated to others out of court that he had been robbed on the occasion in question." (quoting *Phillips v. State*, 177 Miss. 370, 374, 171 So. 24, 26 (1936)).

¶40. The defense also asserted that Rodriguez would testify that she witnessed Todd drive past her house, hold his fingers in the shape of a gun, and pretend to shoot at her and Quinn's son. Defense counsel admitted that Quinn did not witness this incident. The State objected

16

to this testimony, and the trial court ultimately excluded the testimony, explaining that Todd's alleged actions toward Rodriguez did not involve Quinn and that Quinn never testified about this incident.

¶41. In *Sheffield*, this Court emphasized,

> [I]t is essential that the proper predicate be laid for the admissibility of evidence of the victim's propensity for violence, i.e., that the defendant was actually aware of the victim's character so that this prior knowledge colored the defendant's decision regarding the necessity of violent physical effort to avoid an anticipated attack.

*Sheffield*, 844 So. 2d at 522 (¶6). The record before us does not reflect that Quinn had any personal knowledge about the incident between Todd and Rodriguez, and defense counsel admitted that Quinn did not witness the incident. Additionally, the supreme court has held that "the victim's specific acts towards third parties, as testified to by those third parties," are not relevant or admissible "to show the defendant's state of mind towards the victim." *Russell v. State*, 607 So. 2d 1107, 1116 (Miss. 1992).

¶42. After our review, we find that the trial court did not abuse its discretion in excluding Rodriguez's testimony.

### B. Leroy Carson

¶43. The defense next proffered that Leroy Carson would testify he and Todd had interactions in the past where Todd intimidated Carson and attempted to bully him into racing against Todd in his vehicle. Defense counsel asserted that Quinn was aware of this behavior, explaining that Carson had reported Todd's bullying to Quinn's father, and Quinn's father had informed Quinn. The State objected, arguing that Carson's testimony was not relevant

17

because none of the alleged threats Todd made included physical threats. The State asserted Carson had indicated that the only physical incident between him and Todd was when Carson "grabbed [Todd] and basically told [Todd] he wasn't afraid of him." The State also argued that Quinn had never testified that about Todd's behavior toward Carson.

¶44. After hearing arguments, the trial court excluded Carson's testimony, explaining that "it's an attempt to get some type of character evidence before the jury, through third-party hearsay[.]" The trial court also found that the incident between Carson and Todd did not involve Quinn, nor did it involve threats of physical harm or a gun. The trial court stated that "the fact that somebody may be ugly to somebody, or a bully to somebody . . . [does not] rise[] to the level of something that the defendant can try to turn around and rely on and use as character evidence to justify what happened in this case."

¶45. As stated, a third party's testimony regarding the victim's specific acts toward that third party is not relevant or admissible to show the defendant's state of mind toward the victim. *Russell*, 607 So. 2d at 1116. However, Quinn argues that Carson's testimony regarding Todd's specific conduct was admissible under Mississippi Rule of Evidence 405(b). Rule 405(b) provides that instances of a person's specific conduct are admissible in cases where character or the trait of character is "an essential element of a charge, claim, or defense . . . ." MRE 405(b). The supreme court has further clarified that specific past acts are admissible on cross or direct examination "where a defendant alleges self-defense," and "the character trait of violence was an essential element of the defense under 405(b)." *Newsom v. State*, 629 So. 2d 611, 614 (Miss. 1993) (internal quotation marks omitted)

18

(finding that a trial court erred in excluding a defense witness's testimony that "he had seen [the victim] in fights before").

¶46.  In the case before us, the trial court found that the specific act by Todd did not involve a gun or even threats of physical harm, and therefore Carson's testimony was not relevant to show Todd's character trait for violence.  We recognize that "[a] trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence." *Shaw*, 915 So. 2d at 445 (¶8).  Keeping this standard in mind, we cannot say that the trial court abused its discretion in excluding Carson's testimony.

¶47.  Even if the trial court did err in excluding this testimony, we find that such error was harmless.  The exclusion of evidence "cannot amount to reversible error unless it affects a substantial right of a party." *Jordan*, 211 So. 3d at 717 (¶18); MRE 103.  "The refusal of evidence of the character of the victim affects the defendant's right to a fair trial; and thus reversal is required unless 'on the whole record, the error was harmless beyond a reasonable doubt.'" *Id.* at 717-18 (¶18) (quoting *Newsom*, 629 So. 2d at 614).  "Exclusion of evidence of the victim's character is harmless where it was established through other evidence that was admitted." *Id.*  As discussed above, evidence of Todd's violent character was admitted through Quinn's testimony and Kincaid's testimony.

## CONCLUSION

¶48.  After our review, we find that the trial court did not abuse its discretion in excluding the testimony of Quinn's uncle based on a discovery violation by the defense.  We also find that the trial court did not abuse its discretion in excluding additional testimony regarding

19

Todd's violent character. Quinn testified extensively as to his state of mind at the time of the shooting. Quinn also presented evidence that he was scared of Todd and that Todd had previously threatened him with a gun. Accordingly, we find that Quinn was not prejudiced by the trial court's exclusion of the additional character evidence. *See Shaw*, 915 So. 2d at 445 (¶8) (We will not reverse a trial court's ruling as to the exclusion of evidence "unless the judge abuses this discretion so as to be prejudicial to the accused."). We therefore affirm Quinn's conviction and sentence.

¶49. **AFFIRMED.**

**BARNES, C.J., WESTBROOKS, LAWRENCE, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR. WILSON, P.J., McDONALD AND McCARTY, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**